**LAZARD DEBT RECOVERY GP, LLC,** individually, and on behalf of the Lazard Debt Recovery Fund, L.P., and Lazard Debt Recovery Management LLC, Plaintiffs,

v.

Michael A. WEINSTOCK and Andrew J. Herenstein, Defendants.

C.A.No.19503.

Court of Chancery of Delaware.

Submitted July 19, 2004.

Decided Aug. 6, 2004.

Anne C. Foster, Catherine G. Dearlove, Evan O. Williford, Richards, Layton & Finger, P.A., Wilmington, Delaware; Rowan D. Wilson, Thomas G. Rafferty, Kenneth E. Lee, Cravath, Swaine & Moore, New York, New York, for Plaintiffs.

Kenneth J. Nachbar, Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware;

Jonathan Rosenberg, Daniel L. Cantor, John T. Hammer, O'Melveny & Myers, LLP, New York, New York, for Defendant Michael A. Weinstock.

Norman M. Monhait, Rosenthal, Monhait, Gross & Goddess, P.A., Wilmington, Delaware; Kenneth A. Zitter, Law Offices of Kenneth A. Zitter, New York, New York, for Defendant Andrew J. Herenstein.

## OPINION

STRINE, Vice Chancellor.

Lazard Freres & Co. started a fund focused on investing in the securities of distressed companies. To that end, it created controlled subsidiaries to act as the fund's general partner and investment manager, and the general partner invested startup capital to get the fund going. Two Lazard partners, Michael Weinstock and Andrew Herenstein, were employed by the investment manager and the fund and were the key humans who actually invested the capital that Lazard and outside investors placed in the fund.

After the fund was operating, Weinstock and Herenstein began considering leaving the fund to start a similar fund at Quadrangle, a firm started by four former Lazard partners. In the period they were contemplating their possible departure, Weinstock and Herenstein continued to function on behalf of the Lazard-sponsored fund and did not disclose that they were thinking about leaving. Instead, they made general statements to investors about the high quality of Lazard as an employer and that they enjoyed their jobs. Allegedly, during this period new investments came into the fund.

When Weinstock and Herenstein eventually decided to leave Lazard and go to Quadrangle, they came into work one day and resigned effective noon that same day.

According to the complaint, which was filed by the Lazard-sponsored fund, general partner, and investment manager, the departure of Weinstock and Herenstein forced Lazard to wind up the fund. Lacking the ability to replace Weinstock and Herenstein in a sufficiently timely manner to responsibly manage the fund, Lazard's only option other than a wind-up was to accede to Weinstock and Herenstein's offer to "lift-out" the fund to Quadrangle. Lazard refused to accept this offer. In the complaint, the plaintiffs allege that Weinstock and Herenstein intended that their departure would leave Lazard with no option other than transferring the fund to Quadrangle and planned their departure to maximize the chances that would occur. The conduct of Weinstock and Herenstein is further alleged to have violated fiduciary and contractual duties they owed the plaintiffs, and their failure to disclose their consideration of their possible departure is alleged to have been fraudulent.

In this opinion, I address and grant Weinstock and Herenstein's motion to dismiss the complaint, in all but one narrow respect. The reasons for that decision are articulated in full later in this opinion. Pervading the reasoning of the opinion is an important economic reality. Weinstock and Herenstein had no fiduciary duty to remain as employees of the plaintiffs or of Lazard and the complaint fails to allege that they owed any contractual duty to give prior notice of their plans to leave. Any harm that befell the plaintiffs because of Weinstock and Herenstein's departure was a foreseeable one, the risk of which the plaintiffs and investors in the fund were fully informed and which could have been minimized by common contractual techniques.

Any damages suffered by the plaintiffs or Lazard flowed not from unlawful conduct of Weinstock and Herenstein but

from the failure of Lazard and its affiliates to plan for the contingency that their key human capital might exercise its right to depart. The various theories pled in the complaint are generally designed to shift the cost of that economic risk from the entities that bore it to the employees who exercised the economic freedom left to them by their employer.

By contrast, I conclude that the complaint does (weakly but sufficiently) state a claim that Weinstock and Herenstein misused confidential information, in violation of their fiduciary and contractual duties. I therefore deny their motion to dismiss this aspect of the complaint.

## I. *Factual Background*

These are the pertinent facts, as drawn from the amended complaint and the documents it incorporates.

This case centers on the demise of a venture of the investment bank of Lazard Freres & Co. or "Lazard." The plaintiffs are all entities directly or indirectly controlled and/or owned by Lazard. Lazard itself has chosen not to participate directly as a plaintiff although it is commercial injury to Lazard that is the implicit, but clearly discernible, motivation for this lawsuit.

In 2001, Lazard closed its High Yield/Distressed Debt Department and sought to make money from that area of the investing field through another method. That method involved the formation of plaintiff Lazard Debt Recovery Fund, L.P. (the "Fund") and related Lazard-controlled entities that would manage and control the Fund.

The Fund was the entity that would hold investments in the securities of distressed companies. Lazard was not the only investor in the Fund. Rather, the goal of Lazard was to locate outside investors who would invest in the Fund.

To manage the Fund, Lazard formed two other entities that are also plaintiffs in this action. Lazard Debt Recovery GP, LLC (the "General Partner") was the general partner of the Fund. Lazard is the managing member of the General Partner. Lazard Debt Recovery Management LLC (the "Investment Manager") was responsible for the investment of the Fund's capital, subject to control by the General Partner.

Of course, behind these entities, Lazard had to have human beings who could actually deploy their expertise in marketing and investing in order for the Fund to succeed. To satisfy this need, Lazard employed two employees from its former High Yield/Distressed Debt Department, defendant Michael A. Weinstock and defendant Andrew J. Herenstein. Weinstock was a Managing Director of Lazard. Herenstein was a Director of Lazard.

According to the complaint, Weinstock and Herenstein were given several titles connected with the Fund, the General Partner, and the Investment Manager. They were allegedly Co–Managers of the Fund; Principals, Co–Portfolio Managers, Co–Managers and Directors of the Investment Manager; and members of the General Partner. The complaint does not specify exactly what these titles meant or how some of these titles comport with the authority invested in the General Partner and the Investment Manager—*as entities*—with relation to the Fund pursuant to the "Investment Management Agreement" among the Fund, General Partner, and the Investment Manager.[1]

The complaint also alleges that Weinstock and Herenstein personally invested

1. Nachbar Aff. Ex. B (the "Investment Management Agreement").

in the Fund. In connection with making those investments, Weinstock and Herenstein allegedly signed agreements binding them to certain obligations under the "Limited Partnership Agreement" governing the Fund.[2] The extent of those obligations is a subject of dispute that is addressed later in this opinion.

To start up the Fund, the General Partner allegedly expended $8 million that went to create necessary infrastructure, set up the necessary entities, and fund employees. As noted, an Investment Management Agreement was executed among the Fund, the General Partner, and the Investment Manager. Weinstock signed that Agreement on behalf of each Lazard-controlled entity.

In the Investment Management Agreement, the Investment Manager agreed to be bound by the same standard of care applicable to the General Partner under the Limited Partnership Agreement, which "at a minimum," allegedly required the General Partner to "act in good faith and to keep confidential any information relating to the Fund." [3]

The complaint contends that the investing strategy of the Fund involved a great deal of risk and complexity. In its own words, the complaint states:

> 25. Investment in distressed debt is a risky, complicated and potentially lucrative business, in which the Fund's investment team must identify distressed debt opportunities by leveraging off the extensive relationships that have been established with investors, brokers, banks and other advisory professionals. Having identified distressed debt opportunities, the investment team, in this case managed by Weinstock and Herenstein, must then perform rigorous credit analyses and make assessments about intrinsic values and the probability and timing of key events that drive the market recognition of values. Given the volatility and relative instability of distressed debt companies, investments must be monitored daily, with numerous trades being executed each day. As part of their duties as Co–Managers on behalf of the Fund's Partners, Weinstock and Herenstein were engaged in dozens of complex positions requiring sophisticated trading strategies and daily personal attention.[4]

As the key employees of the Investment Manager and the Fund, Weinstock and Herenstein wielded a great deal of discretionary authority to make investment decisions on behalf of the Fund.

Because the Fund's success was so dependent on the skill of its human employees, the marketing efforts undertaken on behalf of the Fund emphasized the talents of the team Lazard had marshaled for the Fund, and in particular the talents of Weinstock and Herenstein. Thus, the Private Placement Memorandum for the Fund highlighted their attributes and noted that "Institutional Investor recognized Weinstock and Herenstein as # 1 ranked analysts in the Distress Debt Sector in 1998." [5]

At some unspecified point in 2001, the Fund had amassed $280 million in capital. On behalf of the Investment Manager, Weinstock and Herenstein were the leaders of the team primarily responsible for investing that capital and they were also helping Lazard recruit new investors to the Fund.

---

**2.** Nachbar Aff. Ex. C (the "Limited Partnership Agreement").

**3.** Compl. ¶ 20.

**4.** *Id.* ¶ 25.

**5.** *Id.* ¶ 27.

Sometime in early 2002, however, Weinstock and Herenstein allegedly began plotting to usurp from Lazard the fruits of its new planting. Worst of all, their plot was cooked up with a former managing director and Deputy CEO of Lazard's, Steven Rattner, who had earlier left Lazard with three other managing directors to create a new private investment firm named Quadrangle Group.

In the complaint's words, Weinstock, Herenstein, and Rattner contrived a plan whereby Weinstock and Herenstein would join Quadrangle and "lift-out" the Fund and its assets from Lazard to Quadrangle. The method by which this would be accomplished was deceptively simple. Because investing in distressed debt securities was risky, complex work, the Fund would be at risk if Weinstock and Herenstein left. Unless Lazard could find qualified employees to step in rapidly for them, the investors' capital would be at risk. Weinstock and Herenstein allegedly knew that Lazard could not replace them quickly enough to continue to operate the Fund and therefore would face the Hobson's choice of either closing the Fund or transferring it to their betrayers at Quadrangle.

At the same time they were discussing this scheme with Rattner, Weinstock and Herenstein continued to function on behalf of the Fund. In particular, they allegedly continued to help market the fund to investors. At no time during this period did Weinstock and Herenstein disclose that they were considering leaving Lazard. Rather, they allegedly proclaimed their happiness at Lazard to prospective investors and to Lazard itself.

Because they are the most detailed allegations in the complaint and the plaintiffs rely upon them as the key to the complaint's viability, the paragraphs of the complaint that deal with this alleged conduct warrant quotation:

38. Specifically, Weinstock and Herenstein in meetings during the first two weeks of February with existing investors, such as UBS, PAAMCO, Signet Research & Advisory and Kredietrust Luxembourg, and prospective investors, such as Horn & Eichewald and Moore Capital, continued to market the fund enthusiastically. During these meetings, existing and prospective clients were presented with Fund marketing materials that touted the management team, which was headed by Weinstock and Herenstein, and the level of respect accorded the team within the distressed debt industry. When asked why they remained at Lazard and at the Fund, both Weinstock and Herenstein indicated that the unique resources existing at Lazard and the Fund rendered Lazard and the Fund the ideal work environment for both defendants. Weinstock and Herenstein, however, failed to indicate that they were planning to leave Lazard and the Fund. That material omission, as well as affirmative misrepresentations to existing and potential clients regarding their reasons for remaining at Lazard, were fraudulent and constituted breaches of their fiduciary duty.

39. For example, on or about February 14, 2002, Herenstein met with representatives of Lazard, Ivan Nedds and John Mackin, and Moore Capital to solicit approximately $40 million for the Fund. At that meeting, after being asked by the potential investor of his future plans, Herenstein represented that he was pleased to be at Lazard and the Fund and that the unique resources of the distressed debt team at Lazard and the Fund enabled defendants to do what they loved—research companies and analyze bonds. Similarly, on February 7 and 11, 2002, in meetings with Horn &

Eichewald and UBS, respectively, Weinstock in the presence of Lazard personnel, Walter Kirkland and Nedds, made similar representations. Defendants, in none of the aforementioned meetings, intimated their intentions to leave the Fund.

40. Again, as recently as February 25, 2002, in a meeting with Lazard personnel Tashjian, Robert DeConcini and Norman Eig, Herenstein reaffirmed his loyalty to Lazard and the Fund.

41. These statements and material omissions regarding defendants' intention to remain with the Fund were made in an attempt to entice investors to invest a substantial sum of money in the Fund and to prevent the Fund from preparing for defendants' immediate departures. By encouraging investors to invest more monies in the Fund, defendants intended to increase the size of the Fund that would be "lifted-out" and transferred to Quadrangle. The attempts succeeded, as the Fund received more monies from investors based on and in reliance on Weinstock's and Herenstein's statements and participation as Co–Managers of the Fund, and that money had to be returned by the Fund as a result of defendants' abrupt departure.[6]

After having made these assurances and having helped the Fund reap in more monies in February 2002, Weinstock and Herenstein delivered stunning news to Lazard. On the morning of February 28, 2002, they announced their intention to resign their positions effective noon that same day. The head of trading for the Fund did the same thing. All three indicated that they were leaving Lazard to form a distressed debt fund at Quadrangle.

When Lazard officials noted that Weinstock and Herenstein were putting the Fund and its investors at risk, Weinstock and Herenstein allegedly said that Lazard had a fiduciary duty to transfer the Fund to Quadrangle to ensure that the investors were not harmed by their departure. In a conversation later that day, Rattner of Quadrangle informed Lazard that Weinstock and Herenstein had signed employment contracts with Quadrangle, as had the Fund's now former head of trading. Rattner noted that with the departure of these key employees, Lazard had "little choice but to transfer the Fund and its assets to Quadrangle where they could be managed by Weinstock and Herenstein."[7] Otherwise, "Rattner indicated that the [Fund's] Partners would suffer severe harm, and the Fund would likely be destroyed."[8]

Lazard did not transfer the Fund to Quadrangle. Instead, the General Partner and the Investment Manager concluded that the Fund should be wound up in an orderly fashion. According to the complaint, this was the only viable option that they had because the nature of the Fund and the abrupt departure of Weinstock and Herenstein made any other strategy imprudent and reckless. The complaint alleges that Weinstock and Herenstein knew and intended that their conduct would leave the General Partner and the Investment Manager with only two choices—accede to their demand for a lift-out of the Fund to Quadrangle or wind-up the Fund—both of which were injurious to them.

II. *The Counts In The Complaint*

The complaint contains four counts.

---

6. *Id.* ¶¶ 38–41.

7. *Id.* ¶ 46.

8. *Id.*

The first count alleges that Weinstock and Herenstein breached fiduciary duties they owed to the Fund and the partners who invested in the Fund. They did so by planning to depart in a manner that gave the General Partner and the Investment Manager no other choice than to close down the Fund or transfer it to Quadrangle.

Oddly, however, the relief sought under this count is specific only as to damages allegedly incurred by the General Partner as a business entity, which is alleged to have wrongfully lost $8 million in startup costs as a result of Weinstock and Herenstein's conduct. How this relates to any fiduciary duty owed to the Fund and its investors is not explained in the complaint.

The complaint also seeks damages in the amount of "any returns the Partners would have achieved had Weinstock and Herenstein not breached their fiduciary duty to those investors." [9] This is a class action claim brought by the Fund on behalf of its individual investors, the limited partners. The amount of these lost returns is not specified at all, nor does the complaint allege that any investor of the Fund actually lost existing value as a result of the termination of the Fund.

Count II is a claim of fraud. The claim is based on the previously quoted statements made by Weinstock and Herenstein in the period between the time they first had discussions with Rattner and their resignation. The statements were allegedly false in that they implicitly represented that Weinstock and Herenstein would remain at Lazard and were injurious in the sense that they induced new investments into the Fund and lulled "Lazard personnel" into believing that they would stay, thereby preventing them from planning a strategy to run the Fund after their departure. The complaint alleges that Weinstock and Herenstein desired both that new investments be made and that Lazard not have any warning of their possible departure as that would put maximum pressure on Lazard to agree to transfer the Fund to Quadrangle.

The damage theory underlying this Count is murky. As to the new investments, the complaint simply says that these had to be returned when the Fund was wound up. There is no indication of what harm this created to anyone. As to the Fund, the General Partner, and the Investment Manager, the damage theory is equally vague. The only thing the complaint says is that the "plaintiffs have been damaged in an amount to be proven at trial" because Weinstock's and Herenstein's departure "cripple[d]" the Fund's ability to continue as a going concern.[10] As Weinstock and Herenstein point out, the only real injury this appears to have caused would be to the General Partner and Investment Manager because they will not be able to generate fees for Lazard by running the Fund.

Count III attempts to set forth a breach of contract claim based on several different arguments. Initially, it alleges that Weinstock and Herenstein were "Directors of the Investment Manager" and were "therefore bound by the terms of the Investment Management Agreement."[11] That Agreement imposed upon the Investment Manager the same standard of care as was required of the General Partner under the Limited Partnership Agreement, a requirement that allegedly included the duty to act in good faith and to keep the Fund's information confidential. Re-

---

9. Compl. ¶ 53.

10. *Id.* ¶ 59.

11. *Id.* at ¶ 61.

latedly, Count III contends that Weinstock and Herenstein are bound to those same duties because by signing subscription agreements to become limited partners in the Fund, they thereby bound themselves to all of the provisions of the Limited Partnership Agreement, including those that apply to the General Partner.

Alternatively, Weinstock and Herenstein are claimed to have violated a provision that purportedly requires any competing partner to act in good faith towards the Fund and to take into account the interests of the Fund and its partners.

By concocting and implementing their so-called "lift-out scheme," Weinstock and Herenstein are alleged to have breached these contractual duties. This Count does not specify the nature or extent of the damages that resulted from this alleged breach. All the Count indicates is that the plaintiffs were harmed in an amount to be proven at trial.

Count IV is the last count in the complaint. It is similar to Count III in that it alleges that Weinstock and Herenstein are bound to the Limited Partnership Agreement for the same reasons stated in Count III. All that is different is that Count IV is premised on the notion that Weinstock and Herenstein breached the Limited Partnership Agreement by "using the Fund's confidential information—including, but not limited to, marketing materials and know-how—to establish a distressed debt business at Quadrangle for defendants' own benefit and to the detriment of the Fund and its Partners."[12] Earlier in the complaint, the "confidential information" the defendants allegedly took is defined to include "sensitive financial information and the investment strategies relating to the Fund's assets along with the identities of the Fund's investors."[13] Regrettably, that is as concrete as Count IV gets.

### III. *Procedural Standard*

This motion arises under Court of Chancery Rule 12(b)(6) and its familiar requirements. Under that Rule, I must draw all reasonable inferences in favor of the plaintiffs and only dismiss the complaint if, after doing so, it fails to state a claim.[14] The requirement to draw reasonable inferences is not an invitation to irrational, plaintiff-friendly speculation, however. Rather, it means that the court must draw reasonable inferences in the plaintiffs' favor to the extent such inferences arise from well-pled facts in the complaint. In ruling upon a motion to dismiss, this court gives weight only to well-pled allegations of fact and not to conclusory accusations of wrongdoing.

As to Count II of the complaint, which purports to state a claim of fraud, the particularity requirements of Court of Chancery Rule 9(b) are implicated. As to this Count, the complaint may only be sustained if the circumstances constituting the fraud are pled with particularity. "The circumstances which shall be stated with particularity in Rule 9(b) refer to the time, place and contents of the false representations, the facts misrepresented, as well as the identity of the person making the misrepresentation and what he obtained thereby."[15]

12. *Id.* ¶ 70.

13. Compl. ¶ 48.

14. *See, e.g., Orman v. Cullman,* 794 A.2d 5, 15 (Del.Ch.2002).

15. *York Linings v. Roach,* 1999 WL 608850, at *2 (Del.Ch. July 28, 1999) (internal quotations and citations omitted).

## IV. *Legal Analysis*

Having set forth the applicable procedural standards, I will now address the four counts of the complaint in their numerical order.

### A. *Does The Complaint State A Claim For Breach Of Fiduciary Duty?*

■ Count I is a breach of fiduciary duty count that attempts to leap from the undisputed premise that Weinstock and Herenstein owed the Fund and its investors certain fiduciary duties to the conclusion that Weinstock and Herenstein owed the Fund and its investors a duty not to resign and begin a competing business, at least not without notice to the Fund sufficient for it to search for and secure qualified replacements for them.

In their answering papers and their complaint, the plaintiffs make much of the discretion entrusted in Weinstock and Herenstein to invest the capital of the Fund and that this investiture of discretion in them (through their employers, the Fund and the Investment Manager) made them fiduciaries of the Fund and its investors. The problem with this argument is that it does not relate to the claims the plaintiffs make. Nowhere in their complaint do the plaintiffs allege that Weinstock and Herenstein violated their fiduciary duties by making even a single improper investment decision on behalf of the Fund.

Instead, what they are alleged to have done wrong is to have plotted their departure from the Fund in order to seek what they perceived as a better opportunity elsewhere, and to have executed their departure in a manner that made it difficult for Lazard to continue to run the Fund itself and that therefore gave Lazard an incentive to accede to the suggestion that the Fund be transferred to Quadrangle. Candidly, I find this argument rather astounding.

Although the complaint is written to suggest that it is shocking that Weinstock and Herenstein departed, a close reading of it and a document it references make the occurrence of that eventuality far less surprising. Start with what is not pled: nowhere is it alleged that Weinstock and Herenstein were contractually forbidden from resigning without prior notice or from competing with the Fund after departure. Lazard has deliberately chosen not to be a plaintiff itself in this case and there is no evidence in the record that Weinstock and Herenstein breached any employment or noncompetition agreements by leaving as they did. As a result, the palpable risk of their departure for greener pastures was at all times a business reality that the Fund, the General Partner, the Investment Manager, and their controlling entity, Lazard, faced.

That they know this is made clear by the Private Placement Memorandum for the Fund—a document cited several times in the complaint. The Private Placement Memorandum indicated that Weinstock and Herenstein were part of the Fund's "core investment team," that the Fund's "investment performance at any given time [would] be substantially dependent on the services of key personnel"; and that "[i]n in the event of the ... departure of [Weinstock or Herenstein, or both of them], the business of the [Fund] may be adversely affected."[16]

The parties with the most comprehensive fiduciary duties to the Fund and its partners were not Weinstock and Herenstein, they were the General Partner and the Investment Manager, both of which were controlled by Lazard. The business

16. Nachbar Aff. Ex. A at 10, 29.

risk to them and to the Fund posed by the importance of human capital to the Fund was one that these entities were responsible for addressing and it is odd for plaintiffs as sophisticated as these Lazard-controlled entities to contend that Weinstock and Herenstein were somehow bound to negotiate handcuffs for themselves as employees, as opposed to the onus being on the Fund and the Investment Manager (both of which were controlled by Lazard) to put in place protective measures i) to ensure that human capital could not depart without prior notice without thereby incurring significant monetary liability for breach of contract and ii) to ensure that there was a short-term transition plan in place to deal with the departure of key money managers.

Notably, the complaint does not allege that there was anything special about February 28, 2002 that made Weinstock and Herenstein's departure that particular day a breach of fiduciary duty. It is not alleged that some particular investment opportunity was then pending that was lost or that turned bad as a result of their hasty departure. Rather, it is the mere fact that they left their jobs without giving prior notice that eventuated the damage that the plaintiffs claim to have suffered.

The duty to prevent this harm, however, does not fall within the scope of Weinstock's and Herenstein's fiduciary duties as agents for the Fund's investors. They did not mismanage the assets of the Fund; they resigned and left those assets for the General Partner and the Investment Manager to manage. Under our law, an agent's fiduciary duty is not without limits. To the contrary, an agent's fiduciary duty is limited by the scope of the agency,[17] a principle the Delaware Supreme Court has recognized in the investment context.[18] Indeed, Count I recognizes that an investment professional's fiduciary duties are defined by her investment responsibilities, insofar as it alleges that the basis of Weinstock and Herenstein's fiduciary duties is the "discretion entrusted to them by the Fund and its investors, ... whose investments they controlled and managed."[19] The complaint fails to allege an abuse of that discretion.[20]

Nor does the complaint allege a breach of any duty that Weinstock and Herenstein might have owed as agents for the Fund itself. That is, the plaintiffs do not even

---

**17.** See RESTATEMENT (SECOND) OF AGENCY § 13 (2004) ("An agent is a fiduciary with respect to matters within the scope of his agency.").

**18.** See O'Malley v. Boris, 742 A.2d 845, 849 (Del.1999) (stating that fiduciary duties of broker to customer "are limited ... by the scope of the agency" granted by the customer, but finding that defendant broker's actions involved an "investment decision" that was within that scope). On remand of O'Malley, the Chancellor reaffirmed the principle that the broker's duty of loyalty "was limited in nature," O'Malley v. Boris, 2002 WL 453928, at *3 n. 16. (Del.Ch. Mar.18, 2002), although he also concluded that the broker breached even that limited duty. Id. at *4.

**19.** Compl. ¶ 51.

**20.** The Restatement of Agency defines the duties of "Agents to Make Investments" as follows:

> Unless otherwise agreed, an agent employed to make or to manage investments has a duty to the principal:
> (a) to use care to invest promptly;
> (b) to invest only in such securities as would be obtained by a prudent investor for his own account, having in view both safety and income, in the light of the principal's means and purposes; and
> (c) to change investments in accordance with changes in the security of the investments or the condition of the principal, if his duties include management.

RESTATEMENT (SECOND) AGENCY § 425 (2004). Obviously, the complaint does not allege that Weinstock and Herenstein breached any duties of this sort.

purport to allege that Weinstock and Herenstein owed fiduciary duties to the Fund as a consequence of the employer-employee agency relationship. If it did, that sort of claim would fail under Delaware Supreme Court precedent stating that "an agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal,"[21] and that the mere fact that employees do not disclose their plans to enter into competition with their employer "is not, without more, a violation of their fiduciary duty of loyalty."[22]

These principles reveal the deficiencies of the complaint. For starters, it is notable that the complaint never attempts to define exactly what sort of prior notice Weinstock and Herenstein would have had to give Lazard for the plaintiffs to have avoided the. harm they claim to have suffered. At oral argument, plaintiffs' counsel was unable to articulate any useful standards by which the length of advance notice supposedly required by Weinstock and Herenstein's fiduciary duties could be determined. This is important because it underscores that nothing in the complaint indicates that they departed in the middle

---

**21.** *Science Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 963 (Del.1980).

**22.** *Id.* at 965. The absence of an allegation that Weinstock and Herenstein breached some sort of duties as employees makes the complaint's focus on the competitive injury to Lazard's distressed debt business all the more strange. Nowhere is it alleged how the formation of another distressed debt fund would injure the Fund's investors. This argument appears to be grounded in the notion that particular investment funds and their investors (as opposed to the promoters of those funds) are injured whenever a fund of the same type is formed by a different promoter. No explication of this odd damages theory is made in the complaint.

At oral argument, plaintiffs' counsel contended that the rule described in *Science Accessories* does not absolve Weinstock and Herenstein because they committed "unfair acts" on their way out the door. Admittedly, there is some language in *Science Accessories* and the Restatement provisions on which it relies suggesting, in broad terms, that if the manner in which an employee leaves for a competing venture involves 1) "unfair" conduct or 2) the use of its confidential information, then that might constitute a breach of fiduciary duty. Frankly, I think this unnecessarily conflates several distinct issues. I agree that if Weinstock and Herenstein misused confidential information, they could potentially be subject to liability, either for breach of the confidentiality provision in the Limited Partnership Agreement or for breach of their fiduciary duties. I will therefore deny Weinstock and Herenstein's motion to dismiss, to the extent that it

seeks to dismiss such a claim. And, had the complaint alleged that they attempted to lure away investors while still employed by the Fund—which it does not—that might also have stated a cognizable claim. But, I simply do not see how an employee's timing of her exercise of her conceded contractual freedom to leave her employer can be a breach of fiduciary duty simply because it was "unfair" or caused the employer "injury." Presumably, the unexpected departure of any key employee would meet that test. Our law is flexible enough to protect against specific, cognizable harms to employers without infringing on the contractual freedom of employees.

Moreover, the plaintiffs reliance on *e4e, Inc. v. Sircar*, 2003 WL 22455847 (Del.Ch. Oct.9, 2004) as support for their novel fiduciary duty claims is misplaced. *Sircar* hardly stands for the proposition that a key employee has a fiduciary duty not to leave his employer without advance notice sufficient to enable the employer to plan for the departure. The employee whose conduct was called into question in *Sircar* had not even left his employer; indeed, the entire purpose of the suit was to obtain a judicial order compelling the employer's board to fire the employee from his position as officer. Because that very employee was also a director on his employer's board, and the derivative complaint alleged that he "attempted to induce key customers and key executives of [the company] to follow him to a competitor," *id.* at *1, these allegations were sufficient to deem the employee "interested" for purposes of a demand futility analysis.

of a particularly important trading day or that the same harm would not have eventuated had Weinstock and Herenstein given, say, two weeks notice.

Indeed, given how crucial Weinstock and Herenstein were to the Fund's business, it is unlikely that either one of them—and certainly not both at the same time—could have departed without causing harm to the Fund unless they gave advanced notice measured in months, rather than weeks. By Lazard's own argument, only a period of that length would apparently give Lazard—an international investment bank with great depth in its ranks—the time to adequately prepare for the departure of these key employees. Thus, under the plaintiffs' theory, if Weinstock or Herenstein decided on a Sunday evening that the fast-paced world of investment management was no longer for them and that a permanent home in the Bahamas sounded much more appealing, they would breach their fiduciary duties if they simply showed up on Monday and gave two weeks' notice—even though no contract prevented them from doing so.

Put simply, although the complaint supports the inference that Weinstock and Herenstein did not behave in a particularly admirable fashion, it does not support an inference that they breached any fiduciary duty they owed to the Fund and/or its investors. Critically, the only thing that Weinstock and Herenstein did that arguably prevented the plaintiffs from continuing with the Fund was deprive the Fund and the Investment Manager of their services without prior notice. Nothing in the complaint indicates that they did not have a right to depart. Therefore, even if Lazard was forced to wind up the Fund and return the partners' invested funds, any harm that it (and its affiliated plaintiffs) suffered was not the product of any breach of fiduciary duty by Weinstock and Herenstein. Instead, that harm (which is pled cursorily) resulted from the choice of Lazard and plaintiffs to discontinue the Fund rather than seek replacements for Weinstock and Herenstein.

If there was insufficient time to obtain replacements, that is because the plaintiffs failed to contractually require Weinstock and Herenstein to provide enough notice of their departure to enable the Fund to make a smooth transition. Furthermore, the plaintiffs could have avoided any harm to the partners of the Fund as investors by transferring the Fund to Quadrangle. In that case, the only harm (based on the pled facts) would have been to Lazard (a nonparty), the General Partner, and the Investment Manager. The harm to them would not have been as investors in the Fund but as promoters and operators who would have lost a source of fee income. No doubt Lazard found that option unpalatable but it was an option that would have permitted the partners of the Fund to continue to benefit from the investment skills of Weinstock and Herenstein. In its fiduciary capacity, the General Partner had the discretion, and arguably the duty, to pursue that option if it felt that Weinstock and Herenstein's continued services were vital to the limited partners.

Put bluntly, the fact that Lazard did not plan adequately for the possible departure of key employees who it knew could depart does not make Weinstock and Herenstein's offer to transfer the Fund from Lazard to Quadrangle a breach of fiduciary duty. That unaccepted offer—which involved merely a statement of the realistic options that Lazard faced, and not some sort of threat—obviously did not cause any harm. Nor did it impair the plaintiffs (and their controller, Lazard) from pressing ahead without the services of Weinstock and Herenstein using borrowed talent from other parts of their large enterprise tem-

porarily until it could land permanent replacements. If they could not do so, that lack of capacity did not flow from the opportunity to lift-out the fund to Quadrangle, but from Lazard's lack of depth.

Critically, Lazard could easily have protected itself from the very acts which it now claims to be a breach of fiduciary duty using a commonly employed technique known as contracting. It could have obtained a contractual promise, backed up by a liquidated damages provision, from Weinstock and Herenstein that they would not leave the Fund for some specified period of time. Or it could have required them to give, say, three months notice of their intended departure, to allow Lazard to engage an executive search firm to replace these irreplaceable employees. Or it could have prohibited them from competing with the Fund for some reasonable period after they left. Lazard failed to purchase any of these contractual protections for itself. I say "purchase" because it is obvious that had Lazard sought such protections, Weinstock and Herenstein would have done what labor with leverage always does in negotiations over employment arrangements, which is demand some increase in compensation or reciprocal obligations from the employer in exchange for undertaking any obligations desired by the employer. To grant Lazard those protections now, after the fact, as a matter of equity, would be to grant employers an important right against employees that they did not bargain for and did not pay for. I fail to see how such a ruling would be an equitable one as it would leave employers with the protection of a free, judicially implied non-competition covenant.

It may be surprising to the plaintiffs, but the fact that labor (Weinstock and Herenstein) used their leverage in connection with their departure does not shock me. Capital (such as Lazard) uses leverage in connection with their dealings with labor every day. There is substantial room for this sort of bargaining in our version of capitalism. I have no doubt that capital would find it extraordinary if this court were to determine that employers were fiduciaries of their employees and owed them lost profits and other damages incurred by those employees when the employer exercised whatever rights it validly possessed to terminate them without prior notice. Every day millions of workers take economic risks in their lives (buy bigger houses or new cars or send their children to private schools or colleges) knowing that they lack any contractually guaranteed right of continued employment and knowing that courts will not bail them out by deeming their employers to be their fiduciaries who must pay damages for any harm an awkwardly timed firing might cause to them. To sustain the plaintiffs' claim for breach of fiduciary duty here would be to create a biased common law of equity whereby employers who fail to protect themselves through contract can seek to control employees by threatening them with suit for breach of ill-defined, judge-imposed fiduciary duties.[23] Nowhere in its papers do the plaintiffs attempt to articulate exactly the scope of those duties and the principles that would provide the foundation for their formulation. This is unsurprising, too, as the duties that employees and employers owe each other are typically shaped by an amalgam of con-

---

**23.** To be balanced, a judicially crafted advance notice provision of the type the plaintiffs seek would have to be accompanied by a judicially imposed severance notice provision providing employees with comparable economic protections. This strikes me as legislative, not judicial terrain.

tract and positive law,[24] not by equity.

What the plaintiffs' controller, Lazard, has sought to do is to transform what might have been some cognizable form of contractual employment claim into a viable claim for breach of fiduciary duty. This Frankensteinian exercise did not work.

Count I will be dismissed.

### B. Does Count II State A Viable Claim For Fraud?

■ Count II is a fraud claim. Because the alleged fraudulent conduct occurred in New York on behalf of New York-based entities, Weinstock and Herenstein claim, without serious dispute from the plaintiffs, that New York law governs this claim. Under New York law, the plaintiffs must plead the following elements in order to state a fraud claim: 1) knowing misrepresentation, concealment or nondisclosure of a material fact; 2) defendant's intent to deceive; 3) plaintiff's justifiable reliance on the misrepresentation; and 4) injury to the plaintiff as a result of such reliance,[25] so-called loss causation. Under Court of Chancery Rule 9(b), the circumstances of the alleged fraud must be plead with particularity, not generality.

Here, the supposed fraud is not pled with great particularity. Paragraphs 38–41 of the complaint, set forth in full previously, are the supposedly particularized allegations of fraud.

These assertions can fairly be distilled to their essence as follows:

In meetings with prospective investors of the Fund during early February, Weinstock and Herenstein continued to market the Fund. When asked why "they remained at Lazard and at the Fund, both Weinstock and Herenstein indicated that the unique resources existing at Lazard and the Fund rendered Lazard and the Fund the ideal work environment" for them.[26] But Weinstock and Herenstein did not indicate that they "were planning to leave Lazard and the Fund." [27] At a meeting in the same time period, a prospective investor allegedly asked Herenstein about his future plans, and Herestein supposedly "represented that he was pleased to be at Lazard and the Fund and that the unique resources of the distressed debt team at Lazard and the Fund enabled defendants to do what they loved—research companies and analyze bonds." [28] At a later meeting, Weinstock allegedly made similar representations. The complaint then goes on to allege generally that certain investors made investments into the Fund after this meeting and that those investments had to be returned when the Fund was wound up. Finally, on February 25, 2002—three days before his resignation—Herenstein supposedly reaffirmed his "loyalty to Lazard and the Fund" to "Lazard personnel" outside the presence of potential Fund investors.[29]

---

24. For example, the common law of many states, including this one, *see Lord v. Souder*, 748 A.2d 393, 400 (Del.2000), emphasizes that, absent an employment contract, employees serve at-will and may, with extremely narrow exceptions, be terminated at any time for any reason not forbidden by statutory laws.

25. *Idrees v. Am. Univ. of the Caribbean*, 546 F.Supp. 1342, 1346 (S.D.N.Y.1982) (citing

*Channel Master Corp. v. Aluminum Ltd. Sales, Inc.*, 4 N.Y.2d 403, 176 N.Y.S.2d 259, 151 N.E.2d 833, 836 (1958)).

26. Compl. ¶ 38.

27. *Id.*

28. *Id.* ¶ 39.

29. *Id.* ¶ 40.

These allegations fail to support a claim of fraud for several related reasons.

Initially, I note that the complaint is in large part little more than a vague mishmash that does not comport with the expectations set forth in Rule 9(b). Rather, the complaint simply alleges that Weinstock and Herenstein made generalized statements of contentment, and failed to indicate the possibility of departure, to various prospective investors, only a few of which are identified, at pitch meetings during a general time period, only a few of which are specified, and that this mix of information amounted to a material misstatement of fact that allegedly induced a certain number (unspecified) of those investors (identity unspecified) to make investments (amount unspecified) that had to be returned at an unspecified time and causing them unspecified harm.

Most important, none of the vague statements made constitute a misrepresentation of material fact in the context in which they were made. At investor pitch meetings of this sort, it was hardly to be expected that Weinstock and Herenstein would trash Lazard or its work environment. As they point out, no rational investor would find it material that Weinstock and Herenstein found Lazard an "ideal work environment" and had "unique resources." This is at best enthusiastic puffery that no rational prospective investor in a distressed fund which required investors to keep their capital invested for a significant period of time [30] would find material.[31]

What would have been material is if Weinstock and Herenstein had represented to potential investors that they were bound by contract to and committed to stay with the Fund for some defined period of time.[32] Only a representation of this kind could have provided any *material* assurance that Weinstock and Herenstein's investing skills would be available to the Fund over a term meaningful to the new investor. Moreover, the complaint alleges cursorily and upon information and belief that Weinstock and Herenstein began their conversations with Quadrangle on February 4, 2002, only days before these meetings with prospective investors oc-

---

**30.** Investors had to commit their capital to the Fund for a one-year period.

**31.** As Weinstock and Herenstein note, generalized statements of corporate optimism, untethered to specific material facts, generally have not been found to be material under the federal securities laws. For examples of statements that have been held immaterial as a matter of law, see, for example, *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119–22 (10th Cir.1997) (statement that there was a "compelling set of opportunities" available to the company); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1219 (1st Cir.1996) (statement that defendant was "confident that [the company] was pursuing the right strategy"), *superseded by statute on other grounds, as noted in Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir.1999); *Lasker v. New York State Elec. & Gas Corp.*, 85 F.3d 55, 59 (2d Cir.1996) (statements that company would not "compromise its financial integrity" and had a "commitment to create earnings opportunities"); *Raab v. Gen. Physics Corp.*, 4 F.3d 286, 289 (4th Cir.1993) (statement that company "is poised to carry the growth and success of 1991 well into the future"); *In re Sun Healthcare Group, Inc. Sec. Litig.*, 181 F.Supp.2d 1283, 1291 (D.N.M.2002) ("Sun continues to demonstrate both its leadership and its preparedness for the new operating environment."); *In re Azurix Corp. Sec. Litig.*, 198 F.Supp.2d 862, 870, 881–82 (S.D.Tex.2002) (statements that "touted" company's ability to become a "successful player" in the global water and wastewater industry), *aff'd, Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003).

**32.** Even if a contract cannot force a party to provide labor, it can validly impose serious enough economic consequences for departure short of the contract term as to provide a material assurance that the employee will remain for the contract term.

curred in the first two weeks of February. No well-pled fact indicates that Weinstock and Herenstein had bound themselves to or even firmly decided in their own minds to depart for Quadrangle as of the time of these meetings.[33]

■ It would seem to me to be odd to formulate a legal rule that would require key employees who might be pondering departure to qualify any statement to potential clients of their firms that their firm has a good work environment and that they like their jobs, with a statement that there are, of course, possibly even greener pastures, that the employees are open to leaving or are actively considering that possibility, and that the clients should know that they might leave. As a general rule of New York law, employees are "under no duty to notify their employer of their plans and preparations since to [do] so would [make] the right to engage in such conduct meaningless."[34] In this case, had Weinstock and Herenstein made such a disclosure, it would simply have repeated the disclosure made in the Private Placement Memorandum that prospective investors in the Fund received. More generally, it would intrude on the space left to employees and agents to consider alternatives to their current situations without imposing reciprocal duties on their employers and principals.

For similar reasons, the complaint fails to plead reasonable reliance. The statements made in the complaint could not form the basis for any rational investor to make an investment decision in the Fund as those statements did not provide any reasonable basis for them to rely upon Weinstock and Herenstein's continued service for any materially significant period of time.

■ Next, the complaint fails to plead loss causation sufficiently. In a wholly conclusory manner that is not particularized in the manner required by Rule 9(b), the complaint alleges that certain investors (unnamed) made investments after the February meetings and that their capital was later returned to them when Lazard closed the Fund. The complaint is wholly devoid of any allegation that they actually lost any of the capital they invested. To the extent that the complaint alleges that these investors lost profits they would have made had Weinstock and Herenstein remained as the money managers for the Fund, New York law does not permit that type of damages for a fraud claim, as it is in the nature of a lost profits claim.[35] The

33. There is simply a vague information and belief pleading that discussions with Rattner began on February 4 and eventually led to a meeting of minds with Weinstock and Herenstein.

34. *Abraham Zion Corp. v. Lebow*, 593 F.Supp. 551, 571 (S.D.N.Y.1984), *aff'd*, 761 F.2d 93 (2d Cir.1985).

35. As the New York Court of Appeals stated, "The true measure of damage [in a fraud action] is indemnity for the actual pecuniary loss sustained as the direct result of the wrong" or what is known as the "out-of-pocket" rule. Under this rule, the loss is computed by ascertaining the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain." Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud. *Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 646 N.Y.S.2d 76, 668 N.E.2d 1370, 1373–1374 (1996) (citations omitted). *See also AFA Protective Sys., Inc. v. AT & T, Inc.*, 57 N.Y.2d 912, 456 N.Y.S.2d 757, 442 N.E.2d 1268, 1269 (1982); *Seiko Time Corp. v. Video Assocs., Inc.*, 99 A.D.2d 941, 472 N.Y.S.2d 633, 634 (1984).

argument in the plaintiffs' brief that the new investors lost the time value of their money because they could have received investment returns on the capital they invested in the Fund during the brief time the Fund held their capital also is in the nature of a lost profits claim and is precluded under New York law.

As with the other Counts, Count II also seeks to recover the $8 million the General Partner allegedly expended to start up the Fund, the Investment Manager, and the General Partner. For the non-divine who do not exist out of time, this claim for damages is chronologically impossible. The start-up costs were incurred well before the supposedly fraudulent statements and could not have been lost as a result of those statements.[36]

Finally, the allegation that Herenstein vaguely affirmed to Lazard personnel his loyalty to Lazard and the Fund on February 25, 2002—a mere there days before he ultimately resigned—is entirely lacking in particularity, is not supported by any pled instance of reasonable, detrimental reliance, and was made to Lazard as Herenstein's employer and Lazard is not a party.

Therefore, for all these reasons, Count II will be dismissed.

C. *Does The Complaint Allege That Weinstock And Herenstein Breached Any Contractual Obligation To The Plaintiffs?*

Count III alleges that the defendants violated two provisions in the Limited Partnership Agreement that prescribe certain standards of conduct. First, it alleges that Weinstock and Herenstein contractually assumed the same contractual duties that the General Partner owed to the Fund

under § 4.06 of the Limited Partnership Agreement and that their conduct violated those duties. Relatedly, the plaintiffs seek to hold Weinstock and Herenstein personally liable under that provision even if the defendants did not assume the duties of the General Partner. Second, the plaintiffs claim that Weinstock and Herenstein violated § 4.05, which assertedly requires limited partners to exercise good faith whenever competing with the Fund.

### 1. *The Complaint Does Not State A Claim That Weinstock And Herenstein Violated § 4.06*

■ Initially, I discuss the plaintiffs' claim that the defendants violated § 4.06. In their complaint and their brief, the thrust of this argument was that Weinstock and Herenstein agreed to be bound by the provisions in the Limited Partnership Agreement applicable to the General Partner, including § 4.06. First, the plaintiffs argue that the Weinstock and Herenstein assumed the same duties as the General Partner by signing "Subscription Agreements" in connection with investing in the Fund as limited partners. By the plain terms of the relevant documents—all of which were expressly referred to in the complaint—the act of signing a Subscription Agreement did not have the effect of subjecting Weinstock and Herenstein to the same obligations as the General Partner. Rather, in the Subscription Agreement he signed, Weinstock "join[ed] in and agree[d] to be bound by the [Limited Partnership] Agreement *as a limited partner.*"[37] The only purpose for signing the Subscription Agreement was to set the terms on which Weinstock made his per-

---

**36.** Nor, for the same reason, could those funds have been expended in reasonable reliance upon those statement.

**37.** Nachbar Aff. Ex. D (Subscription Agreement) at SA–6 (emphasis added).

sonal investment in the Fund.[38] By its terms, the Limited Partnership Agreement gives the General Partner "complete and exclusive power and responsibility," [39] to the exclusion of limited partners who have "no part in the management, control or operation of the [Fund's] business." [40] The plaintiffs' argument that the obligations of Weinstock under the Limited Partnership Agreement are unqualified by the limitations contained in the Subscription Agreement lacks any logical force, as it is clear that the two Agreements must be read together to interpret the duties of any limited partner who became subject to the Limited Partnership Agreement by signing a Subscription Agreement. The specific provision of the Subscription Agreement indicating that signatories are agreeing to join and be bound to the Limited Partnership Agreement as limited partners trumps any more general language to the contrary.[41] Therefore, Weinstock did not assume the same duties as the General Partner simply by signing a Subscription Agreement to invest in the Fund.

■ Likewise, Herenstein did not bind himself to those duties for the very same reasons plus one additional reason. Herenstein signed the Subscription Agreement on behalf of a family partnership as its general partner and not individually.

■ Nor are Weinstock and Herenstein contractually bound to observe the same standards of conduct as the General Partner under the Limited Partnership Agreement simply because they exercised investment discretion in their capacities as employees of the General Partner and the Investment Manager. That theory is simply a rehash of the plaintiffs' untenable breach of fiduciary duty claim and does not provide any basis for imposing contractual duties upon Weinstock and Herenstein.

Next, the plaintiffs' complaint alleges that Weinstock and Herenstein were somehow bound to the same contractual duties as the General Partner because the Investment Manager—as an entity—signed the Investment Management Agreement, and that Agreement provides that the "Investment Manager agrees to be bound by all of the terms and provisions of the [Limited] Partnership Agreement applicable to it, as delegatee of the General Partner." [42] The Investment Manager is an LLC and a legal entity. Its directors—if there be any—are not personally liable for "debts, obligations and liabilities of [the] limited liability company, whether arising in contract, tort or otherwise." [43] Any contractual obligations that the Investment Manager assumed as an entity are therefore owed by it, and not by its disclosed principals.[44] Moreover, the

38. *Id.* at SA–1 (indicating that Weinstock was subscribing for "Interests in the [Fund]").

39. Limited Partnership Agreement § 4.01(a).

40. *Id.* § 4.04.

41. *See Stasch v. Underwater Works, Inc.*, 52 Del. 397, 158 A.2d 809, 812 (1960). Despite the plaintiffs' protestations to the contrary, the boilerplate language on the signature page of the Subscription Agreements that they contend subjects limited partners to the same duties as the General Partner (by supposedly binding limited partners to every provision of

the Limited Partnership Agreement) cannot rationally be read in the de-contextualized manner the plaintiffs suggest and, even in isolation, cannot fairly be read to impose the same duties on limited partners as are owed by the General Partner.

42. Investment Management Agreement ¶ 3.

43. 6 *Del. C.* § 18–303(a).

44. *See Pennsylvania House, Inc. v. Kauffman's of Delaware, Inc.*, 1998 WL 442701, at *2 (Del.Super. May 20, 1998) ("An agent who

allegation that Weinstock and Herenstein were somehow "Directors" of the Investment Manager is inconsistent with that entity's LLC Agreement, which does not provide for a board of directors. Absent the creation of a board in an LLC agreement,[45] an LLC does not have a board of directors [46] and there is no well-pled fact indicating that the Investment Manager created a board to which Weinstock and Herenstein were appointed.

 Lastly, even if Weinstock and Herenstein were bound to the same standard of conduct that the Investment Manager assumed by signing the Investment Management Agreement—i.e., the same standard as the General Partner—Count III would not stand against them. The only delegated authority that the Investment Manager took on was for investment and trading activities. And the Investment Manager only agreed to be bound to the Limited Partnership Agreement to the extent "applicable to it, as delegatee of the General Partner." [47] The complaint does not allege that Weinstock and Herenstein violated any standard of care in making

investment or trading decisions as employees of the Investment Manager.

At oral argument, when it became clear that the plaintiffs' theory that Weinstock and Herenstein assumed the duties of the General Partner under the Limited Partnership Agreement would not pan out, plaintiffs' counsel raised a new argument, not raised in the briefs, based on a curious reading of § 4.06(a), which I now set out in full:

The General Partner (which terms [sic] shall include for the purpose of this Section 4.06 each member, shareholder, manager, director, officer, employee and, with the approval of the General Partner, agent, of the General Partner, its Affiliates and their respective executors, heirs, assigns, successors or other legal representatives) (each an "Indemnified Person") shall not be liable to the [Fund] or to any of its Limited Partners for (i) any loss or damage occasioned by any acts or omissions in the performance of its services under this Agreement, unless such loss or damage is due

---

contracts on behalf of a disclosed principal and within the scope of his authority, in the absence of an agreement to the contrary, or other circumstances showing that he has expressly or impliedly incurred or intended to incur personal responsibility, is not personally liable to the other contracting party."); *G & G Restaurant, Inc. v. New G & G Corp.*, 1991 WL 35703, at *4 (Del.Super.Mar.4, 1991) (corporate officers not personally liable on agreements "between the corporate entities acting through their corporate officers"); *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 987 (Del.Ch.1987) ("[T]hose in control of a corporation are not typically liable for distinctly corporate obligations by reason of that control.").

45. Weinstock and Herenstein presented a copy of that document in their opening papers. The plaintiffs do not dispute its authenticity or plain terms, and I take judicial notice of it. *Accord In re Frederick's of Hollywood,*

*Inc.*, 2000 WL 130630, at *6–*7 (considering plain terms of certificate of incorporation in ruling on a motion to dismiss).

46. *Child Care of Irvine, LLC v. Facchina*, 1998 WL 409363, at *4 (Del.Ch. July 15, 1998). Rather than create a board of directors, the Investment Manager's LLC Agreement designates Lazard itself as both the Investment Manager's sole "Member" and its "Managing Member," designations which carry power over the LLC's affairs. Nachbar Aff. Ex. F. ¶¶ 6, 7(a). The Agreement further provides that "[a]ny Managing Member appointed pursuant to Section 7(a) may resign at any time upon written notice to the Member." *Id.* ¶ 7(b). This provision further refutes the idea that the person or entity in charge at the Investment Manager—whatever his or its title—was precluded from exercising the contractual freedom to resign.

47. Investment Management Agreement ¶ 3.

to willful misconduct, bad faith, or gross negligence of the General Partner or as otherwise required by law, or (ii) for losses or damages due to the negligence, dishonesty, or bad faith of an agent of the General Partner, unless such agent was selected, engaged or retained without reasonable care; provided, however, that nothing in this Agreement shall be construed as waiving any legal rights or remedies which the [Fund] may have under state or federal securities laws, as amended from time to time.[48]

Plaintiffs' counsel argued that because § 4.06(a) defines "General Partner" to include "member[s]" of the General Partner, which Weinstock and Herenstein allegedly are, § 4.06(a) imposes on them an affirmative obligation to observe the standards of care described in that provision or face personal liability for failure to do so. That contention is plainly based on a misinterpretation of this provision.

Rather than create liability for every "member, shareholder, manager, director, officer, [and] employee" of the General Partner who fails to comply with the standard of conduct described in § 4.06(a), that provision creates a safe harbor for all such "Indemnified Persons," insulating those who do comply with it from liability to which they might otherwise be exposed for violating duties imposed by other provisions of the Limited Partnership Agreement or, more generally, by positive law. Section 4.06(b) goes on to provide indemnification and advancement rights, and explicitly ties the availability of those rights to § 4.06(a):

> In (i) any suit brought by the Indemnified Person to enforce a right to indemnification hereunder, it shall be a defense that, and (ii) in any suit in the name of the [Fund] to recover expenses advanced pursuant to the terms of an undertaking, the [Fund] shall be entitled to recover such expenses upon a final adjudication that, the Indemnified Person or other person claiming a right to indemnification hereunder has not met the applicable standard of conduct set forth in Section 4.06(a).[49]

Thus, for example, a "manager" of the General Partner could assert § 4.06(a) as a defense against claims brought by limited partners for breach of fiduciary duty or of some other provision of the Limited Partnership Agreement applicable to her in her role as manager. Section 4.06(b) would permit that manager to obtain advancement of expenses, and to be indemnified for any liability ultimately imposed—so long as the manager complied with § 4.06(a). But noncompliance with § 4.06(a), in and of itself, is not a basis for holding the manager personally liable to the limited partners in circumstances when default law would not provide limited partners with a basis to sue the manager directly. Rather, the plaintiffs must show i) that the manager breached duties to them under default law and ii) that their misconduct was sufficiently egregious as to fall outside the protections afforded by § 4.06.

That reality is ever more apparent when one considers another hypothetical. Assume that a clerical employee, acting with gross negligence, mistranscribed a phone message to one of the Fund's traders and thereby caused the Fund to miss an investment opportunity. Would § 4.06(a) provide a basis for holding her personally liable to the limited partners for the damages caused? That cannot be the reasonable import of § 4.06(a). The fact that § 4.06(a) does not expand the duties of

**48.** *Id.* § 4.06(a).

**49.** *Id.* § 4.06(b).

"Indemnified Persons" is further confirmed by § 4.06(c), which provides:

> To the extent that, at law or in equity, an Indemnified Person has duties (including fiduciary duties) and liabilities relating thereto to the [Fund] or to any Partner, an Indemnified Person acting under this Agreement shall not be liable to the [Fund] or to any Partner for its good faith reliance on the provisions of this Agreement. *The provisions of this Agreement, to the extent they restrict the duties and liabilities of an Indemnified Person otherwise existing at law or in equity, are agreed by the parties hereto to replace such other duties and liabilities of such Indemnified Person.*[50]

This provision makes clear that the Limited Partnership Agreement is intended solely to "restrict"—but not expand—any legal or equitable duties an "Indemnified Person" would otherwise owe the Fund and its partners—creating a useful shield for the General Partner and its affiliates. Thus, Weinstock and Herenstein can be held personally liable only if they have violated fiduciary or other contractual duties applicable to them in their role as "members" of the General Partner, *and* their conduct does not meet the standards set forth in § 4.06(a). Put simply, § 4.06(a) is not an independent basis for personal liability at all, and the plaintiffs' claim based on that provision is therefore dismissed.

### 2. The Complaint Does Not State A Claim That Weinstock And Herenstein Violated § 4.05

The plaintiffs also rely on § 4.05(b), which they read as providing that "when engaging in any competitive enterprise, Weinstock and Herenstein owed the Fund and its Partners a duty to act in good faith, taking into account the interests of the Fund and its Partners."[51] Section 4.05(b) is fairly complex and should be set out at length:

> Each Partner agrees that any other Partner and any partner, director, officer, shareholder, member, Affiliate or employee of any other Partner, may engage in or possess an interest in other business ventures or commercial dealings of every kind and description, independently or with others, including, but not limited to, management of other accounts, investment in, or financing, acquisition and disposition of, securities, investment and management counseling, brokerage services, serving as directors, officers, advisers or agents of other companies, partners of any partnership, or trustee of any trust, or entering into any other commercial arrangements, and will not be disqualified solely on the basis that any such activities may conflict with any interest of the parties with respect to the [Fund]. Without in any way limiting the foregoing, each Partner hereby acknowledges that, provided that such persons act in good faith, taking into account the interest of the [Fund] and that the General Partner exercises reasonable compliance oversight, (i) none of the Partners or their respective Partners, directors, officers, shareholders, members, Affiliates or employees shall have any obligation or responsibility to disclose or refer any of the investment or other opportunities obtained through activities contemplated by this paragraph (b) of Section 4.05 to the General Partner or the Limited Partners, but may refer the same to any other party or keep such opportunities for their own benefit; and (ii) the Partners and their respective partners, directors,

---

**50.** *Id.* § 4.06(c) (emphasis added).

**51.** Compl. ¶ 63.

officers, shareholders, members, Affiliates and employees are hereby authorized to engage in activities contemplated by this paragraph (b) of Section 4.05 with, or to purchase, sell or otherwise deal or invest in Investments issued by, companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the [Fund], without the consent or approval of the [Fund] or any other Partner.[52]

A close reading of this provision makes clear why the plaintiffs' claim lacks merit. Contrary to their contention, this provision does not impose some all-encompassing obligation of good faith on any limited partner competing with the Fund. The second sentence of § 4.05(b) provides, in effect, that no Partner or its "partners, directors, officers, shareholders, members, Affiliates [and] employees" is required (i) to "disclose or refer [to the General Partner or the limited partners] any of the investment or other opportunities obtained through activities" in competition with the Fund, or (ii) to obtain the "consent or approval" of the Fund or any Partner to deal or invest in "companies in which the General Partner might from time to time invest or be able to invest or otherwise have any interest on behalf of the [Fund]," so long as they "act in good faith, taking into account the interest of the [Fund]." Weinstock and Herenstein's alleged bad faith action, however, has nothing to do with a failure to inform the Fund of investment opportunities or to obtain consent to deal or invest in companies in which the Fund might have an interest. The complaint does not allege that Weinstock and Herenstein failed to pass along to the Fund an investment opportunity learned of while at

Quadrangle, or usurped for the benefit of Quadrangle any specific investment opportunity of which they became aware in their roles at the Fund. Section 4.05(b)'s good faith obligation applies only to actions of this kind, and not to every single action that a limited partner (and its partners, directors, etc.) might undertake. The complaint therefore does not state a claim that Weinstock and Herenstein breached § 4.05(b).

For all these reasons, Count III will be dismissed.

## IV. Does The Complaint State A Claim That The Defendants Violated A Contractual Duty Of Confidentiality?

I therefore turn to the sole remaining count, Count IV, which alleges that Weinstock and Herenstein breached certain confidentiality provisions in § 7.05 of the Limited Partnership Agreement by using confidential information to "establish a distressed debt business at Quadrangle." [53] Section 7.05 prohibits limited partners from disclosing or using "any information or matter relating to the [Fund] and its affairs and any information or matter related to any Investment." [54] The "confidential information" Weinstock and Herenstein are alleged to have misused includes "proprietary marketing materials and know-how" and "sensitive financial information and the investment strategies relating to the Fund's assets along with the identities of the Fund's investors." [55]

Under the lenient pleadings standards applicable on a motion to dismiss, these allegations state a claim of breach of § 7.05. Although § 7.05 does not apply to information that "is publicly known at the

---

**52.** Limited Partnership Agreement § 4.05(b).

**53.** Compl. ¶ 70.

**54.** Limited Partnership Agreement § 7.05.

**55.** Compl. ¶ 48.

time of proposed disclosure by [a] Limited Partner" or that "becomes legally known to such Limited Partner other than through disclosure by the [Fund] or the General Partner,"[56] the complaint can be read to plead—albeit in a cursory manner—that Weinstock and Herenstein took information that is not excluded from § 7.05's ambit by this proviso. For example, if Weinstock and Herenstein used a physical or electronic copy of the list of the Fund's customers—rather than simply using whatever information was in their memories—in their efforts at starting up Quadrangle's business, that could breach § 7.05—as well their fiduciary duties. As plaintiffs' counsel noted at oral argument, the plaintiffs cannot plead this claim with any more particularity because they cannot know precisely what Weinstock and Herenstein might have taken until they obtain some discovery in this action. I will therefore permit Count IV[57] to proceed.

The procession of this count does not mean, however, that the plaintiffs have a right to damages based on Weinstock's and Herenstein's use of their "know-how," but only to reap fair compensation for their use of specific, confidential information belonging to the Fund.[58]

### V. Conclusion

This is an odd case in which the real dispute—which is between Lazard as an employer and two of its former employees—provides the obvious motivation for the claims actually pled by the employer's controlled entities. The complaint filed by the controlled entities, however, fails to state a claim upon which relief can be granted in all but one narrow respect, to wit, that the defendants misused confidential information in contravention of the Limited Partnership Agreement and their fiduciary duties. The parties shall proceed with discovery limited only to the remaining claims and the other claims are dismissed.

IT IS SO ORDERED.

---

**56.** Limited Partnership Agreement § 7.05

**57.** As well as Count I, to the extent that Count alleges a breach of fiduciary duty based on misuse of confidential information. *See supra* note 22.

**58.** *See Pfizer, Inc. v. ICI Americas, Inc.,* 1984 WL 8262, at *8 (Del.Ch. Nov.21, 1984) (information classified as "know-how" is only protectible if the information has been maintained as confidential, is not generally known by others, and cannot be readily ascertained through other proper means).