# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| TRIFECTA MULTIMEDIA HOLDINGS INC., and DAVE YOUNG, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2023-0699-JTL |
| WCG CLINICAL SERVICES LLC, | ) ) ) | |
| Defendant. | ) | |

## OPINION ADDRESSING MOTION TO DISMISS

Date Submitted: February 7, 2024
Date Decided: June 10, 2024

Bradley R. Aronstam, Roger S. Stronach, Holley E. Newell, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; David S. Flugman, Lauren J. Zimmerman, Korey Boehm, SELENDY GAY PLLC, New York, New York; *Attorneys for Plaintiffs*.

Susan W. Waesco, Emily C. Friedman, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; William C. Jackson, Ashley Moore Drake, GOODWIN PROCTER LLP, Washington, D.C.; Ariel E. Rogers, GOODWIN PROCTER LLP, Redwood City, California; Lauren E. Jackson, GOODWIN PROCTER LLP, Boston, Massachusetts; *Attorneys for Defendant*.

**LASTER, V.C**

A private equity portfolio company acquired a healthcare technology company. The healthcare company offered services to facilitate clinical trials, including a unique flagship product. The healthcare company alleges that the portfolio company fraudulently induced it to enter into a purchase agreement by claiming that the portfolio company would be the best partner for growth, would allow the healthcare company to continue operating autonomously, would support the healthcare company's sales and marketing efforts, and would generally help the healthcare company secure new contracts and sell its flagship product.

The healthcare company argues that the portfolio company was actively pursuing an IPO at the time of the purchase. The IPO strategy included acquiring technology companies to boost its IPO valuation. The portfolio company allegedly structured its deals for minimal up-front consideration and large backend payments with the expectation that the backend payments would never be made.

The healthcare company believes it fell victim to that scheme. The consideration it received consisted of some cash up front, contributions to existing employee equity plans, equity in the surviving company, and earnout payments if the healthcare company hit revenue milestones in the three years after the purchase. The healthcare company believes the portfolio company never intended to pay the backend consideration.

Shortly after the purchase, the portfolio company split the healthcare company's flagship product into two separate products, eliminating the flagship product's main competitive advantage as an integrated solution. The portfolio

company refused to allow sales personnel to market the product as an integrated solution. The healthcare company alleges that the portfolio company also interfered with its ability to secure new customers and refused to supply it with the resources it needed to succeed. The healthcare company contends that these were intentional acts, designed to ensure that the earnout revenue milestones would not be met.

In this action, the healthcare company asserts claims for fraud, breach of the implied covenant of good faith and fair dealing, breach of contract, and indemnification. The portfolio company moved to dismiss all counts. This decision grants the motion to dismiss with respect to Count II and a portion of Count I. Otherwise, the motion is denied.

## I.     FACTUAL BACKGROUND

The facts are drawn from the operative complaint and the documents it incorporates by reference.[1] At this stage of the case, the complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

### A.     The Sale Process

Trifecta Multimedia LLC ("Trifecta" or the "Company") offered video-based online training for investigators conducting clinical trials. Over time, the Company developed an integrated suite of products, called Investigator Space, to support physicians and pharmaceutical companies conducting clinical trials.

---

[1] Citations in the form "Compl. ¶ ___" refer to the complaint, which is the operative pleading. Dkt. 1. Citations in the form "MIPA § ___" refer to the Membership Interest Purchase Agreement, which is the central document at issue in this litigation and is attached to the complaint as Exhibit A. Dkt. 1.

In 2018, the Company entered into a seven-year master services agreement with its largest customer, Eli Lilly and Company, under which the Company would support all of Eli Lilly's clinical trials. By 2019, the Company had achieved revenue of $25 million and was growing at 16% per year.

Dave Young was the Company's founder. Together with his spouse they owned 100% of the Company's equity. With the Company performing well, Young became interested in a potential sale.

In June 2019, Young met with investment bankers at Crosstree Capital Partners ("Crosstree") and developed a list of potential buyers. In January 2020, he attended a healthcare conference where Crosstree set up meetings with ten potential buyers. Crosstree provided each buyer with a teaser that projected 2020 revenue of $30 million, EBITDA of $12 million, and year-over-year growth above 20%. Nine of the ten expressed interest in further discussions.

Based on the level of interest, Crosstree planned to conduct a competitive bidding process. Crosstree commissioned a quality of earnings study and began working on a Confidential Information Presentation.

## B. The Pandemic

While Crosstree was preparing for the sale process, the COVID-19 pandemic swept across the United States. The Company and Crosstree put the sale process on hold.

The pandemic created unprecedented challenges for clinical trials, and the Company was uniquely positioned to address them. Between March and June 2020,

3

the Company added thirteen new clients, including large pharmaceutical companies. The Company's year-to-date revenue grew by 11.4%.

## C. The Sale Process Resumes

In June 2020, two potential buyers contacted Young and Crosstree to resume discussions. One was Advarra, Inc.; the other was WCG Clinical Services LLC ("WCG").

Crosstree and Young gave presentations to both companies. Those presentations included projections that Crosstree created based on (i) revenue under the Company's existing contracts, (ii) additional projected revenue from existing clients, and (iii) still more projected revenue from future clients (the "Forecast"). The Forecast anticipated revenue of $39,895,000 in 2020, $48,703,000 in 2021, $65,503,000 in 2022, and $79,979,000 in 2023. Based on the Forecast, Crosstree valued the Company at more than $200 million.

Crosstree and Young provided the Forecast to Advarra and WCG. Both asked for information about revenue concentration and dependence on Eli Lilly.

In response, Crosstree gave both potential buyers a presentation about the Company's enterprise opportunities pipeline. The plan categorized pharmaceutical company customers according to the following tiers:

- "Early Adopters" who used the Company's products for one-off studies;

- "Vendors of Choice" who used the Company's products for multiple studies;

- "Enterprise Points" who used one of the Company's products for all of their studies;

- "Enterprise Full-Stacks" who used multiple Company products across all studies; and

4

- "Enterprise Collaborators" who collaborated with the Company on new products.

The Company and Crosstree estimated that moving a single pharmaceutical company from the Early Adopter tier to an Enterprise-level tier would generate an additional $10–$15 million in recurring annual revenue under a multi-year contract.

Crosstree informed the potential buyers that the Company had three existing Enterprise-tier customers. The Company also had two near-term Enterprise-tier prospects: Regeneron Pharmaceuticals, Inc., and Janssen Pharmaceuticals. The Company had supported both prospects in clinical trials for COVID-19 treatments.

In August 2020, Crosstree reached out to private equity firm Excellere Partners, a third potential buyer. Crosstree gave Excellere the same information and presentations.

## D. The Offers

In early September 2020, the three potential buyers submitted indications of interest. Excellere and Advarra proposed acquisitions at values of more than $200 million. WCG offered $150 million, consisting of $120 million in up-front cash, plus another $30 million in potential earnout payments based on EBITDA targets.

Young told WCG that its offer was substantially below the others. WCG responded by (i) adding WCG equity worth $20 million to the upfront consideration, (ii) adding another $5 million in upfront cash earmarked for the Company's employees; (iii) restructuring the earnout to use revenue targets; and (iv) uncapping the earnout so that Young and his spouse would receive every dollar by which the Company's revenue exceeded the targets in 2021, 2022, and 2023.

5

Young also asked the other bidders to improve their offers. Over the next week, the three bidders submitted nonbinding letters of intent:

- Excellere offered $118.7 million at closing, plus an additional $41.3 million in rollover equity in the post-transaction entity, for total consideration of $160 million.[2]

- Advarra offered $160 million at closing plus an earnout worth up to $20 million for hitting a revenue milestone in 2023, then dollar-for-dollar consideration for any revenue above the milestone.[3]

- WCG offered $125 million in cash at closing, $20 million of WCG equity that would vest over three years, $5 million at closing earmarked for the Company's employees, plus earnout consideration "up to or exceeding $58.2 million" if the Company exceeded revenue targets of $39 million in 2021, $43 million in 2022, and $52 million in 2023.[4]

Young decided not to pursue Excellere's offer, believing the firm lacked the management experience to help promote the Company's growth. That left the offers from Advarra and WCG.

WCG's letter of intent (the "LOI") made the difference. Young thought it described a shared vision for growth:

> We are very enthusiastic about the impact that our partnership can have on improving the quality of clinical research. The combination of (i) Trifecta's expertise in training and safety letter distribution and its unifying technology platform, (ii) WCG's market presence in over 4,000 global clients, contribution to >90% of clinical trials, and our world-renowned scientific expertise, and (iii) our shared commitment to

---

[2] Compl. ¶ 49.

[3] *Id.*

[4] *Id.* ¶ 50.

improving the quality of clinical research, make this a truly unique combination that will help propel the growth of both organizations.[5]

The LOI also discussed support and resources WCG would provide, including "WCG's >100 sales and marketing professionals to support its existing sales efforts" plus "collaboration, coordination, and shared relationships across WCG's 4,000+ clients."[6]

The LOI also indicated Young would have a significant degree of autonomy:

> In the previous acquisitions and integrations WCG has completed, each of which were very successful, WCG has centralized the management of key corporate functions (CFO, General Counsel, etc.), while allowing each of the acquired divisions to continue to operate independently (including retaining all local corporate functions) . . . . [T]his operating structure provides the best environment for realizing the benefits of the combined business.[7]

Young understood WCG was promising to provide resources, support, and a shared vision for growth.

Young decided that despite the lower upfront consideration, WCG was the best partner for the long-term. He executed the LOI with WCG on September 12, 2020.

**E.    The Company And WCG Negotiate The Purchase Agreement.**

With a signed LOI in hand, the Company and WCG began negotiating a Membership Interest Purchase Agreement (the "Purchase Agreement"). During the negotiations, Young spoke regularly with Nicholas Slack, then-Chief Commercial Officer of WCG. Young repeatedly told Slack that he was "trusting and relying" on

---

[5] *Id.* ¶ 55.

[6] *Id.* ¶¶ 57–58.

[7] *Id.* ¶ 56.

him.[8] Slack reassured Young that they would be "shoulder to shoulder going after deals."[9] WCG further assured Young that Investigator Space would be the "front door" for clients and that WCG had no competing training solutions.[10]

Alex McGilvray of Clark Trevithick, P.C. represented the Company, and Barbara Shander of Morgan Lewis & Bockius LLP represented WCG. Morgan Lewis prepared the first draft of the Purchase Agreement. In a section titled "Contingent Amount," it provided for WCG to make earnout payments if the Company hit revenue milestones of $39 million in 2021, $43 million in 2022, and $52 million in 2023 (the "Revenue Milestones"). Those milestones tracked the LOI. But the language specifying the level of efforts WCG would provide did not.

McGilvray raised the efforts issue with Morgan Lewis. He proposed including an explicit statement that WCG would undertake good faith efforts to hit the Revenue Milestones. Morgan Lewis responded that the specific language was unnecessary because under Delaware law, the implied covenant of good faith and fair dealing obligated WCG to act in good faith to hit the Revenue Milestones and make the earnout payments. McGilvray apparently took that assertion at face value, and he did not insist on explicit language.

---

[8] *Id.* ¶ 67.

[9] *Id.* ¶ 68.

[10] *Id.* ¶ 69.

Another negotiating point involved the product lines that would count toward the Revenue Milestones. WCG's initial draft only included revenue from the Company's products. But the Company was concerned about a WCG product called Safety Portal that could potentially compete with Investigator Space. Investigator Space comprised three products that each serviced a different aspect of clinical trials. Investigator Space packaged the products together and marketed them as an "integrated solution."[11] One of the products in the Investigator Space suite was Safety Vigilance. Safety Vigilance and Safety Portal offered substantially similar services and competed directly with one another.

If WCG pushed Safety Portal rather than Investigator Space, then it could negatively affect the Company's revenue. To solve the issue, WCG agreed to count revenue from Safety Portal towards the Revenue Milestones. But WCG also told the Company that Safety Portal would produce at least $14 million in "guaranteed" revenue, so the Revenue Milestones should be increased by $14 million each year.

To reflect those changes, Morgan Lewis circulated a new draft of the Purchase Agreement. The definition of "Revenue" now included "the revenue of the Buyer and its Affiliates (other than the Company) with respect to its Safety Portal offering."[12] The new draft also adjusted the Revenue Milestones upward by $14 million per year, equating to $53 million for 2021, $57 million for 2022, and $66 million for 2023. The

---

[11] *Id.* ¶ 31

[12] *Id.* ¶ 65.

9

new draft did not contain any language guaranteeing a minimum of $14 million from Safety Portal.

Crosstree had projected that the Company would achieve revenue of $48.7 million for 2021, $63.5 million for 2022, and $80 million for 2023, before the addition of Safety Portal's "guaranteed" $14 million per year. With the additional revenue from Safety Portal, Crosstree valued the potential earnout at $60,134,000, which was $10,949,000 more than the LOI.

## F. The Deal Closes.

To facilitate the transaction, the Purchase Agreement called for a sell-side, pre-closing reorganization. Young and his spouse, as the Company's sole owners, formed Trifecta Multimedia Holdings, Inc. ("Holdings") and contributed 100% of their membership interests in the Company to Holdings. That resulted in the Company being a wholly subsidiary of Holdings, and Young and his spouse owning all of Holdings' equity.

The Purchase Agreement called for a simultaneous signing and closing. The closing involved a complicated series of transactions that resulted in Holdings selling a portion of its membership interests in the Company to WCG. Holdings transferred the remaining membership interests to a WCG affiliate in exchange for LP units amounting to the $20 million in WCG equity promised under the Purchase Agreement. The $20 million in WCG equity would vest over three years. The WCG affiliate entity then transferred all of its membership interests in the Company to WCG.

10

In addition to the $20 million in WCG equity, Holdings, Young, and Young's spouse (together, the "Sellers") received $125 million in cash, $25.5 million earmarked for Company employees, and the right to receive earnout payments if the Company exceeded the Revenue Milestones.

The executed Purchase Agreement stated that if the Company's revenue for the next three fiscal years (2021, 2022, and 2023) equaled or exceeded the Revenue Milestones, then WCG would pay Sellers "the aggregate amount by which the Company's Revenue for such fiscal year exceeds [the Revenue Milestones]."[13] The Purchase Agreement defined "Revenue" as,

> the sum of (i) the revenue of the Buyer and its Affiliates (other than the Company) with respect to the implementation, licensing, and other revenues attributable to WCG Safety Portal™, Buyer's global safety document distribution technology, and (ii) the Company's revenue, in each case determined in accordance with GAAP.[14]

The executed Purchase Agreement also included an indemnification provision calling for WCG to indemnify the Company against losses caused by "any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement" or "any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement."[15] The parties also agreed to a provision stating that "the parties shall be entitled to specific performance

---

[13] MIPA § 2.06 (the "Earnout Provision"); *id.* § 2.06(c)(i)–(iii).

[14] *Id.* § 2.06(b).

[15] *Id.* § 7.03 (the "Indemnification Provision"); *Id.* 7.03(a)–(b).

of the terms of [the Agreement], in addition to any other remedy to which they are entitled at law or in equity."[16]

## G.    Post-Closing Events

Shortly after closing, WCG began to engage in conduct that Young viewed as contrary to its pre-closing promises. Young came to believe that WCG was trying to stifle the Company's growth and prevent it from achieving the Revenue Milestones.

### 1.    Splitting Investigator Space In Two

One week after closing, WCG split Investigator Space in two by separating its safety products from its training product. WCG also instructed its sales personnel not to offer Investigator Space or its component parts as an integrated solution to clients.[17] Before closing, Young had touted Investigator Space as the "only fully integrated solution in the marketplace for site-training, safety letter delivery, and document exchange."[18] He viewed the integrated product as a key competitive advantage.

---

[16] *Id.* § 8.11 (the "Specific Performance Provision").

[17] Compl. ¶ 82.

[18] *Id.* ¶ 83.

When Young confronted Donald Deieso, WCG's President and CEO, about splitting Investigator Space in two, Deieso responded that putting the product back together was "off the table."[19] He told Young that he did not "want to hear it again."[20]

## 2. Providing Insufficient Resources

During negotiations, WCG had assured the Sellers that the Company would have support for its sales efforts, including from "WCG's >100 sales and marketing professionals."[21] Before the deal closed, the Company employed six full-time sales associates. In the first sixty days after closing, five left, and WCG did not replace them. Making matters worse, WCG forced the one remaining sales associate to sell other products as well. That lone employee could devote at most 30 hours per week to the Company's products—less than 12.5% of the time the sales team devoted before the acquisition.

The Company also had access to some of WCG's sales associates, but WCG required that they sell other products too. And WCG refused to provide sufficient training on the Company's products. WCG's sales associates also did not have "demo accounts" and could not provide hands-on instruction for Company products.

---

[19] *Id.* ¶84.

[20] *Id.* ¶84.

[21] *Id.* ¶ 87.

### 3.     Limiting New Customer Acquisition

Before closing, the Sellers expected the Company to secure long-term, Enterprise-tier contracts with Regeneron and Janssen. Regeneron had even sent the Company a formal request for a proposal to serve as its primary provider of training and safety solutions. WCG prevented the Company from offering Investigator Space to Regeneron as an integrated solution. Instead, WCG intervened and insisted that the proposal be broken into two, with one proposal for training services and a separate proposal for safety products. For the safety products component, WCG promoted Safety Portal over Safety Vigilance. WCG also proposed creating a new site portal for Regeneron rather than using the Investigator Space portal. The president of WCG's Clinical Services Organization told Young that she would "rather lose the Regeneron site portal business than let them use Investigator Space."[22] Regeneron only accepted the proposal for the safety business that used Safety Portal.

WGC likewise scuttled the Company's efforts to secure Janssen as an Enterprise-tier client. Young had spent more than two years developing the Janssen opportunity, culminating in Janssen representatives attending a Company user forum after WCG's acquisition of the Company had closed. Unbeknownst to Young, WCG's Vice President of Business Development met with a Janssen representative just days before that forum. Young later learned that the WCG executive was

---

[22] *Id.* ¶ 93.

14

confrontational and disrespectful. Janssen did not hire WCG, and Slack told Young that he was "glad that we lost" the opportunity.[23]

WCG also interfered with the Company's ability to secure business from AbbVie. Young had been pursuing AbbVie's business for years, and the Company had conducted two prior studies with AbbVie. But instead of pursuing AbbVie as a client for the Company, WCG funneled AbbVie's training business to UL EduNeering ("UL"), a competitor. Then-WCG President and CEO Deieso had previously served as Executive Chairman and CEO of UL, and he had maintained a close business relationship with UL. Among other things, WCG and UL had partnered on a venture called "WCG Academy," which provided compliance certifications for clinical trial professionals.

### 4. Failing To Deliver Safety Portal Revenue

During the negotiations, WCG guaranteed that Safety Portal would contribute $14 million in annual revenue toward the Revenue Milestones. On that basis, the parties increased each Revenue Milestone by $14 million. But Safety Portal failed to deliver those numbers.

During the negotiations, WCG also claimed that Safety Portal leveraged advanced artificial intelligence technology. In reality, Safety Portal did not use any artificial intelligence technology. Instead, it used an outdated technology that WCG had failed to update.

---

[23] *Id.* ¶ 94.

15

Even as WCG's Safety Portal product struggled, WCG declined to invest resources into Safety Vigilance. Ultimately, WCG was forced to shut down Safety Portal entirely, leaving only Safety Vigilance to contribute to the Revenue Milestones.

**5.    Lack Of Autonomy**

In the LOI, WCG had indicated that Young would have autonomy. Instead, he found that he had "no formal authority over commercial opportunities, strategy, or execution" and had not been allowed to "sp[eak] to a single prospective customer."[24]

**H.    Young Confronts WCG.**

In February 2021, four months after the deal closed, Young complained to Jill Johnson, President of WCG's Clinical Services Organization and Young's manager. It is unclear whether or how Johnson responded to Young.

In April 2021, six months after the deal closed, Young confronted Tamara Bowles, WCG's Vice President of Human Capital Management, about WCG's failure to provide sales and marketing support. Bowles told Young that "at WCG, there is always an onboarding period for the founders of newly acquired WCG companies" during which they have to "reconcile what they've been told versus the reality of WCG."[25] Her comment implied that WCG regularly made misrepresentations to sell-side founders.

---

[24] *Id.* ¶ 101.

[25] *Id.* ¶ 102.

Also in April 2021, Young emailed Deieso about WCG's lack of support.[26] He noted that the Eli Lilly contract was temporarily overperforming and masking serious weakness in the sales pipeline.

Ian Neilson, WCG's Chief Technology Officer, responded weeks later. He refused to address Young's complaints and insisted the Company was in good shape. He noted that the Company' year-to-date bookings were $16,654,837, that Safety Portal's were $6,648,633, and that the Company was roughly 44% of the way to achieving the 2021 Revenue Milestone.

Despite Neilson's reassurances, the Company did not achieve the 2021 Revenue Milestone. Young argues that the Company could have attained the 2021 Revenue Milestone if the WCG executives had listened to his concerns.

## I.     The Company Does Not Achieve The 2022 Milestones.

A similar story unfolded in 2022. In April, Young emailed Slack, who had taken over for Deieso as President of WCG. Young asked that WCG confirm its commitment to expanding the Company's Enterprise-tier customers. Slack never responded.

The next day, Young emailed Barbara Shander, WCG's Chief Legal Officer. He detailed his many complaints, then concluded: "WCG [has] repeatedly frustrated the earnout agreement, despite [the Company] meeting or exceeding its obligations."[27]

---

[26] *Id.* ¶ 103.

[27] *Id.* ¶ 106

17

Young did not receive a direct response. Young later raised his concerns directly with Deieso, who had retained his role as a WCG director after stepping down as President. Deieso told Young that that his behavior was "selfish and turns people off."[28] He added that Young should "shut [his] mouth" and focus on increasing the value of the WCG stock that Young had received in the deal.[29] Young responded by asking Deieso why the earnout payments were in the Purchase Agreement if Young was not allowed to mention them. Deieso told Young to "stop talking about it" and called him a "very greedy person."[30]

Despite Young's complaints, WCG did not change its approach. The Company failed to meet the 2022 Revenue Milestone.

**J.    WCG Fails To Provide Annual Revenue Statements Or Make Earnout Payments.**

The Purchase Agreement obligated WCG to provide the Sellers with annual statements identifying the amount of revenue generated each year that would count towards the Revenue Milestones (the "Annual Revenue Statements"). WCG had to submit each Annual Revenue Statement within thirty business days after completing its audited financial statements.

WCG did not provide the Annual Revenue Statement for fiscal years 2021 or 2022 until July 5, 2023. WCG only sent them after Young threatened to file suit.

---

[28] *Id.* ¶ 107.

[29] *Id.*

[30] *Id.*

18

The Annual Revenue Statement for 2021 credited the Company with revenue of $49.8 million, below the Revenue Milestone of $53 million. The Annual Revenue Statement for 2022 credited the Company with revenue of $39.6 million, below the 2022 Revenue Milestone of $57 million. WCG did not make earnout payments for fiscal year 2021 or 2022.

## K.    This Litigation

The Sellers filed this action on July 11, 2023. The Complaint has four counts.

- Count I asserts a claim for fraud based on material misrepresentations and omissions during the negotiations.

- Count II asserts a claim for breach of the implied covenant of good faith and fair dealing based on WCG's failure to assist the Company in achieving the Revenue Milestones.

- Count III alleges that WCG breached the Purchase Agreement by failing to deliver the Revenue Statements by the deadlines set out in the Purchase Agreement.

- Count IV asserts a claim under the Indemnification Provision for "Losses incurred" by the Sellers "arising out of . . . any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to [the Purchase] Agreement."[31]

WCG moved to dismiss the complaint in its entirety.

## II.    LEGAL ANALYSIS

WCG moved to dismiss the complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted. When considering a Rule 12(b)(6) motion, the court (i) accepts as true all well-pleaded factual allegations in the

---

[31] MIPA § 7.03(b).

19

complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiffs.[32] The court need not, however, "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[33]

## A.    Fraud

In Count I, the Sellers assert a claim against WCG for common law fraud.[34] A claim for fraud requires (i) a false representation, (ii) the defendant's knowledge of or belief in its falsity or the defendant's reckless indifference to its truth, (iii) the defendant's intention to induce action based on the representation, (iv) reasonable reliance by the plaintiff on the representation, and (v) causally related damages.[35] WCG advances a series of arguments for dismissal.

---

[32] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011).

[33] *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

[34] Technically, the plaintiffs frame Count I as a claim for fraudulent inducement. Under Delaware law, there is no difference between a claim for fraudulent inducement and a claim for fraud. *See Maverick Therapeutics, Inc. v. Harpoon Therapeutics, Inc.*, 2020 WL 1655948, at *26 (Del. Ch. 2020) ("The elements of fraud and fraudulent inducement are the same."); *accord Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at *31 (Del. Ch. 2018) ("Under Delaware law, the elements of fraudulent inducement and fraud are the same.").

[35] *Prairie Cap. III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015) (citing *Stephenson v. Capano Dev., Inc.,* 462 A.2d 1069, 1074 (Del. 1983)).

### 1.    Non-Actionable Puffery

WCG argues that some of the alleged misrepresentations underlying Count I were "nothing more than puffery."[36] That term refers to "a 'vague statement' boosting the appeal of a service or product that, because of its vagueness and unreliability, is immunized from regulation."[37] Under Delaware law, a counterparty's optimistic statements praising its own "skills, experience, and resources" are "mere puffery and cannot form the basis for a fraud claim."[38]

The following statements on which the Sellers claim to have relied constituted non-actionable puffery:

- WCG said that it would be "the best partner to accelerate growth" in the Company's business.

- WCG said that it would be "shoulder to shoulder going after deals" with the Company.

- WCG said that the Company would benefit from the WCG's "collaboration, coordination and shared relationship across WCG's 4,000+ clients."

---

[36] DOB 16.

[37] David A. Hoffman, *The Best Puffery Article Ever,* 91 Iowa L. Rev. 101, 103 (2006).

[38] *Solow v. Aspect Res.,* LLC, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004); *see, e.g., Winner Acceptance Corp. v. Return on Cap. Corp.,* 2008 WL 5352063, at *8 (Del. Ch. Dec. 23, 2008) (holding statements to be "mere pun and puffery" where defendant "promised that with his expertise and management he would expand the mail business" and that the existing "postal business and the Fleet were just a 'postage stamp of [what the defendant could] orchestrate this mail business to be'"); *Lazard Debt Recovery GP, LLC. v. Weinstock,* 864 A.2d 955, 971 (Del. Ch. 2004) (holding statements in which party touted its "ideal work environment" and "unique resources" to be "at best enthusiastic puffery that no rational prospective investor . . . would find material").

21

- WCG said that it would "support the Company with over 100 sales and marketing staff."

Each is a vague statement of "corporate optimism" designed to boost WCG's appeal as a strategic partner.[39] They are "classically vague statements that a commercial party routinely makes during deal-making courtship."[40]

The other statements on which the plaintiffs rely are sufficiently specific to fall outside the bounds of puffery.

### 2. Scienter

WCG next argues that the complaint fails to plead facts supporting a reasonable inference of scienter. To state a claim for fraud, the complaint's allegations must support a reasonable inference "that the alleged misrepresentations were known to be false when made."[41] "[B]ecause any attempt to require specificity in pleading a condition of mind would be unworkable and undesirable," Rule 9(b) only requires that the claim "allege sufficient facts from which it can reasonably be inferred that this 'something' was knowable and that the defendants were in a position to know it."[42]

---

[39] *Airborne Health, Inc. v. Squid Soap, LP (Squid Soap II)*, 2010 WL 2836391, at *8 (Del. Ch. July 20, 2010).

[40] *Id.*

[41] *Labyrinth, Inc. v. Urich*, 2024 WL 295996, at *13 (Del. Ch. Jan. 26, 2024) (cleaned up).

[42] *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1050 (Del. Ch. 2006) (cleaned up).

22

A claim for fraud generally must concern something knowable, such as "either a past or contemporaneous fact or a future event that falsely implies an existing fact."[43] A counterparty's failure to perform under a contract does not support an inference of fraud unless the pled facts support an inference that "at the time the promise was made the speaker had no intention of performing."[44] Here, the Sellers have met that standard.

The Sellers first point to the timing of WCG's post-closing actions, which began happening soon after the transaction closed. The Sellers allege that almost immediately after the closing, WCG prevented Company personnel from speaking with potential customers. That was contrary to the pre-closing plan that the Company would continue operating independently. Just one week after closing, WCG split the Company's integrated Investigator Space offering into two separate products. That was contrary to WCG's promise that it intended to use Investigator Space's integrated platform as a means to unify WCG's applications. Within sixty days after closing, the Company only had only one full-time sales employee, contrary to WCG's promise during negotiations to support the Company with over 100 sales and marketing staff.

The Sellers also allege that WCG had a motive to make promises that it never intended to keep because the private equity firm backing WCG—Arsenal Capital

---

[43] *Winner Acceptance Corp.*, 2008 WL 5352063, at *7 (citing *Berdel, Inc. v. Berman Real Est. Mgmt., Inc.,* 1997 WL 793088, at *8 (Del. Ch. Dec. 15, 1997) (applying Florida law but noting that Delaware law is the same)).

[44] *Id.*

Partners—wanted to achieve liquidity by taking WCG public. Arsenal and WCG were pursuing a roll-up strategy, and Arsenal had backed WCG in making a series of acquisitions in an effort to assemble a portfolio of products that could support a lofty implied valuation. The Sellers contend that WCG wanted to add the Company's products to its portfolio, enhance its IPO prospects, and enable Arsenal to liquidate a substantial portion of its holdings, while avoiding having to pay the earnout.

Because the facts supporting an inference of scienter can be alleged generally, those allegations are sufficient at the pleading stage. WCG cannot obtain dismissal of Count I due to lack of scienter.

### 3. Reliance

The third element of a fraud claim is justifiable reliance. To plead this element, a plaintiff must allege facts making it reasonably conceivable that the plaintiff acted based on the material representation or omission. Assessing reliance requires a context-dependent inquiry that takes into account the plaintiff's knowledge and experience. The issue is not generally suitable for resolution on a motion to dismiss unless a fully integrated contract contains an explicit anti-reliance representation.[45]

WCG contends that the Purchase Agreement contains the necessary contractual language. The Purchase Agreement contains an integration clause:

> This Agreement and the other Transaction Documents constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersede all

---

[45] *See TrueBlue, Inc. v. Leeds Equity P'rs IV, LP*, 2015 WL 5968726, at *7 (Del. Ch. Sept. 25, 2015); *Arwood v. AW Site Servs., LLC*, 2022 WL 705841, at *23 (Del. Ch. Mar. 9, 2022).

prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter. In the event of any inconsistency between the statements in the body of this Agreement and those in the other Transaction Documents, the Exhibits and Seller Disclosure Schedules (other than an exception expressly set forth as such in the Seller Disclosure Schedules), the statements in the body of this Agreement will control.[46]

But an integration clause, standing alone, is not sufficient to bar a fraud claim; the agreement must also contain explicit anti-reliance language.[47]

WCG contends that in the *Albertsons* case,[48] this court created an exception to that rule. The *Albertsons* decision stated that "[w]hile anti-reliance language is needed to stand as a contractual bar to an extra-contractual fraud claim based on factual misrepresentations, an integration clause alone is sufficient to bar a fraud

---

[46] MIPA § 8.06.

[47] *Kronenberg v. Katz*, 872 A.2d 568, 593 (Del. Ch. 2004) ("Stated summarily, for a contract to bar a fraud in the inducement claim, the contract must contain language that, when read together, can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside the contract's four corners in deciding to sign the contract. The presence of a standard integration clause alone, which does not contain explicit anti-reliance representations and which is not accompanied by other contractual provisions demonstrating with clarity that the plaintiff had agreed that it was not relying on facts outside the contract, will not suffice to bar fraud claims."); *Abry P'rs*, 891 A.2d at 1059 ("[M]urky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations."); *Airborne Health, Inc. v. Squid Soap (Squid Soap I)*, 984 A.2d 126, 141 (Del. Ch. 2009) ("An anti-reliance provision must be explicit, and a standard integration clause is not enough.").

[48] *S'holder Representative Servs. LLC v. Albertsons Cos., Inc.*, 2021 WL 2311455 (Del. Ch. June 7, 2021).

claim based on expressions of future intent or future promises."[49] For that proposition, the *Albertsons* court relied on *Black Horse Capital, LP v. Xstelos Holdings, Inc.*[50] There, the court held that the problem for the plaintiffs in that case was that the "[c]omplaint and related documents ma[de] clear that [the plaintiffs] promised, in several clear integration clauses of negotiated agreements, that they would not rely on promises and agreements outside of those writings."[51] The *Black Horse* court concluded that because the statements the plaintiffs relied on "were not misrepresentations of material fact . . . but rather prior parol evidence that would vary the extant terms in the subsequent integrated writings," the integration clause barred the fraud claim.[52]

Both decisions relied on *Abry Partners*. There, the parties to an acquisition agreement disclaimed reliance on any extra-contractual representations or warranties. When the buyer sued for fraud and sought to rescind the agreement, then-Vice Chancellor Strine enforced the anti-reliance provision. At the same time, he observed that Delaware law has "not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-

---

[49] *Id.* at \*12 (footnote omitted).

[50] 2014 WL 5025926 (Del. Ch. Sept. 30, 2014).

[51] *Id.* at \*24.

[52] *Id.*

contractual statements."[53] He later stated that "[i]f parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners."[54]

The *Albertsons* and *Black Horse* decisions thus relied on *Abry Partners* for a proposition that *Abry Partners* rejects. The assertion that an integration clause standing alone bars a fraud claim is also contrary to the *Kronenberg* decision, also written by then-Vice Chancellor Strine, where he observed that "many learned authorities state that typical integration clauses do not operate to bar fraud claims based on factual statements not made in the written agreement."[55] Although a minority of decisions distinguish between misrepresentations of fact (fraud in the factum) and other types of misrepresentation (fraudulent inducement), the prevailing majority rule does not draw that distinction. Instead, a court applying the majority rule asks,

> whether a fraudulent misrepresentation (as opposed to, say, a warranty) has been made and whether the party asserting the fraud would have entered the agreement had it known the representation was false; if not, the contract should be voidable to the same extent as if there were no merger clause and, indeed, as if there were no writing, and the parol evidence rule should not be applied.[56]

---

[53] *Abry P'rs.*, 891 A.2d at 1058.

[54] *Id.* at 1059.

[55] *Kronenberg*, 872 A.2d at 592 & n.45 (collecting cases).

[56] 11 Williston on Contracts § 33:24 (4th ed.), Westlaw (May 2024 update).

27

The *Abry Partners* decision adopted the majority rule, and Delaware otherwise does not distinguish between fraud and fraudulent inducement.[57] The absence of an anti-reliance clause is therefore dispositive. The integration clause standing alone is not sufficient.

WCG asserts that even without an anti-reliance clause, the complaint's allegations do not support an inference of reliance, but that is not so. It is reasonably conceivable that the plaintiffs relied on the representations that WCG made. Young alleges that WCG's representations caused him to choose WCG as a strategic partner over other viable alternatives. After crediting the Young's allegations, as the court must at the pleading stage, it is reasonable to infer that he relied on WCG's statements when deciding whether to enter into the Purchase Agreement. WCG's motion to dismiss Count I is therefore denied, except with respect to the statements identified as puffery.

## B. Breach Of The Implied Covenant Of Good Faith And Fair Dealing.

In Count II, the Company alleges that WCG breached the implied covenant of good faith and fair dealing by intentionally frustrating the Company's ability to achieve the Revenue Milestones. Count II fails to state a claim on which relief may be granted.

---

[57] *See Maverick Therapeutics, Inc.*, 2020 WL 1655948, at *26 ("The elements of fraud and fraudulent inducement are the same."); *accord Great Hill Equity P'rs IV, LP*, 2018 WL 6311829, at *31 ("Under Delaware law, the elements of fraudulent inducement and fraud are the same.").

The Delaware Supreme Court has summarized the implied covenant concisely as follows:

> The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that . . . neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting.[58]

To successfully plead an implied covenant claim, a plaintiff must allege "a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff."[59]

When determining whether to invoke the implied covenant, a court "first must engage in the process of contract construction to determine whether there is a gap that needs to be filled."[60] "Through this process, a court determines whether the language of the contract expressly covers a particular issue, in which case the implied covenant will not apply, or whether the contract is silent on the subject, revealing a gap that the implied covenant might fill."[61] The court must determine whether a gap exists because "[t]he implied covenant will not infer language that contradicts a clear

---

[58] *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (cleaned up).

[59] *Cantor Fitzgerald, L.P. v. Cantor*, 1998 WL 842316, at *1 (Del. Ch. Nov. 10, 1998).

[60] *Allen v. El Paso Pipeline GP Co., L.L.C.*, 113 A.3d 167, 183 (Del. Ch. 2014), *aff'd*, 2015 WL 803053 (Del. Feb. 26, 2015) (ORDER).

[61] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *16 (Del. Ch. Nov. 17, 2014).

exercise of an express contractual right."[62] "[B]ecause the implied covenant is, by definition, *implied*, and because it protects the *spirit* of the agreement rather than the form, it cannot be invoked where the contract itself expressly covers the subject at issue."[63]

"If a contractual gap exists, then the court must determine whether the implied covenant should be used to supply a term to fill the gap. Not all gaps should be filled."[64] One reason a gap might exist is if the parties negotiated over a term and rejected it. Under that scenario, the implied covenant should not be used to fill the gap left by a rejected term because doing so would grant a contractual right or protection that the party "failed to secure . . . at the bargaining table."[65]

But contractual gaps may exist for other reasons. "No contract, regardless of how tightly or precisely drafted it may be, can wholly account for every possible contingency."[66] "In only a moderately complex or extend[ed] contractual relationship,

---

[62] *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

[63] *Fisk Ventures, LLC v. Segal*, 2008 WL 1961156, at *10 (Del. Ch. May 7, 2008), *aff'd*, 984 A.2d 124 (Del. 2009) (ORDER).

[64] *Allen*, 113 A.3d at 183.

[65] *Aspen Advisors LLC v. United Artists Theatre Co.*, 843 A.2d 697, 707 (Del. Ch. 2004), *aff'd*, 861 A.2d 1251 (Del. 2004).

[66] *Amirsaleh v. Bd. of Trade of City of N.Y., Inc.*, 2008 WL 4182998, at *1 (Del. Ch. Sept. 11, 2008).

the cost of attempting to catalog and negotiate with respect to all possible future states of the world would be prohibitive, if it were cognitively possible." [67]

Equally important, "parties occasionally have understandings or expectations that were so fundamental that they did not need to negotiate about those expectations."[68] "The implied covenant is well-suited to imply contractual terms that are so obvious . . . that the drafter would not have needed to include the conditions as express terms in the agreement."[69]

The implied covenant claim in this case ordinarily would fail because the plaintiffs plead that their lawyer asked for a term at the bargaining table and that WCG's lawyer rejected it. But there is a twist. WCG's lawyer did not reject the language because WCG would not agree to the obligation. According to the complaint, WCG's lawyer represented that Delaware law already incorporated the requested obligation into the contract through the implied covenant. As far as WCG's lawyer was concerned, the term that the Sellers requested was already part of the deal. It didn't have to be included because the common law supplied it, not because the parties disagreed about it.

---

[67] *Credit Lyonnais Bank Nederland, N.V. v. Pathe Commc'ns Corp.*, 1991 WL 277613, at *23 (Del. Ch. Dec. 30, 1991) (Allen, C.).

[68] *Katz v. Oak Indus. Inc.*, 508 A.2d 873, 880 (Del. Ch. 1986) (Allen, C.) (quoting *Corbin on Contracts* § 570 (Kaufman Supp. 1984)).

[69] *Dieckman*, 155 A.3d at 361.

Analytically, that is not an implied covenant claim. But the fact that the Sellers have styled Count II as an implied covenant claim is not inherently fatal. "Delaware has adopted the system of notice pleading that the Federal Rules of Civil Procedure ushered in, which rejected the antiquated doctrine of the 'theory of the pleadings'— *i.e.*, the requirement that a plaintiff must plead a particular legal theory."[70]

Under the theory of the pleadings, which was a feature of pleading at common law and of code pleading in some jurisdictions, a complaint had to "proceed upon some definite theory, and on that theory the plaintiff must succeed, or not succeed at all."[71] If the facts did not support the theory that the plaintiff had picked, then the court would not grant relief, even if the facts established an entitlement to relief under a different theory.[72]

The Federal Rules of Civil Procedure "effectively abolished the restrictive theory of the pleadings doctrine, making it clear that it is unnecessary to set out a legal theory for the plaintiff's claim for relief."[73] Under the Federal Rules of Civil

---

[70] *HOMF II Inv. Corp. v. Altenberg*, 2020 WL 2529806, at *26 (Del. Ch. May 19, 2020), *aff'd*, 263 A.3d 1013 (Del. 2021).

[71] *Mescall v. Tully*, 91 Ind. 96, 99 (1883).

[72] *See* Fleming James, Jr., *The Objective and Function of the Complaint: Common Law—Codes—Federal Rules*, 14 Vand. L. Rev. 899, 910–11 (1961).

[73] 5 Charles Alan Wright, Arthur R. Miller & A. Benjamin Spencer, *Federal Practice and Procedure* § 1219 (4th ed.), Westlaw (database updated June 2024) [hereinafter Wright & Miller] (footnote omitted).

Procedure, "particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not."[74]

> [T]he federal rules—and the decisions construing them—evince a belief that when a party has a valid claim, he should recover on it regardless of his counsel's failure to perceive the true basis of the claim at the pleading stage, provided always that a late shift in the thrust of the case will not prejudice the other party in maintaining a defense upon the merits.[75]

Delaware adopted the federal rules and embraced their approach to pleading.[76] Court of Chancery Rule 8, which governs pleading, is based on the federal model, and Rule 8(f) provides that "[a]ll pleadings shall be so construed as to do substantial justice." The real question is whether the complaint contains a short, plain statement of facts sufficient to support a claim against WCG related to its representations at the bargaining table.

The pled facts could support a claim that there was a meeting of the minds on the term that the Sellers' counsel proposed and WCG's counsel rejected. That,

---

[74] *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir. 1945) (Clark, J.).

[75] 5 Wright & Miller, *supra*, § 1219 (footnote omitted). *See generally Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11–12 (2014) (per curiam) (reversing dismissal of complaint for failure to articulate a claim under 42 U.S.C. § 1983; explaining that the Federal Rules of Civil Procedure reject the "theory of the pleadings" and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted").

[76] *See* Hon. Daniel L. Herrmann, *The New Rules of Procedure in Delaware*, 18 F.R.D. 327, 327 (1956) ("In 1948, the Courts of Delaware shook off the shackles of mediaeval scholasticism and adopted Rules governing civil procedure modeled upon the Federal Rules of Civil Procedure." (quotation marks omitted)).

however, is the type of parol agreement that the integration clause bars. While a standard integration clause alone will not bar a fraudulent inducement claim, a standard integration clause does bar the admission of extrinsic evidence "for the purpose of varying or contradicting the terms of that contract."[77] "Delaware law holds that the parol evidence rule bars the admission of preliminary negotiations, conversations and verbal agreements when the parties written contract represents the entire contract between the parties."[78] If the Sellers' counsel and WCG's counsel came to a separate agreement about the term the Sellers' counsel proposed, that is precisely the kind of separate agreement that the parol evidence rule forecloses.

The pled facts also could support a claim for fraud if there was reason to believe that WCG's attorney knew the statement about what the implied covenant would provide was false when made. Pleading fraud "require[s] a certain level of scienter on

---

[77] *Phillips v. Wilks, Lukoff & Bracegirdle, LLC,* 2014 WL 4930693, at *3 (Del. Oct. 1, 2014) (ORDER); *accord TrueBlue, Inc.*, 2015 WL 5968726, at 4; *see also Taylor v. Jones,* 2002 WL 31926612, at *3 (Del. Ch. Dec. 17, 2002) (describing the parole evidence rule as "a principle of substantive law that prevents the use of extrinsic evidence of an oral agreement to vary a fully integrated agreement that the parties have reduced to writing").

[78] *MicroStrategy, Inc. v. Acacia Rsch. Corp.*, 2010 WL 5550455, at *13 (Del. Ch. Dec. 30, 2010) (cleaned up) (first citing *Carlson v. Hallinan,* 925 A.2d 506, 522–23 (Del. Ch. 2006) ("If a written contract represents the entire agreement of the parties it is said to be 'integrated.'"); then citing *Addy v. Piedmonte,* 2009 WL 707641, at *9 (Del. Ch. Mar. 18, 2009) ("Clauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of integration.")).

34

the part of the defendant[.]"[79] As discussed previously, a party can plead scienter by alleging facts which support an inference that the defendant acted with knowledge of the falsity of a statement or with reckless indifference to its truth.[80] The Sellers have not pled facts sufficient to support an inference that WCG's attorneys had knowledge that their statements about the implied covenant were false. WCG's attorneys may well have been mistaken about the state of the law.

Count II fails to state a claim on which relief may be granted. Count II is dismissed.

## C.    Breach Of Contract

In Count III, the Company alleges that WCG breached the Purchase Agreement by failing to deliver timely Annual Revenue Statements. That count easily states a claim on which relief can be granted.

The elements of a claim for breach of contract are (i) a contractual obligation, (ii) a breach of that obligation by the defendant, and (iii) a causally related injury that warrants a remedy, such as damages or in an appropriate case, specific performance.[81] All of those elements are met.

---

[79] *Metro Commc'ns Corp. BVI v. Advanced Mobilecomm Techs. Inc.*, 854 A.2d 121, 143 (Del. Ch. 2004) (quoting *DRR, L.L.C. v. Sears, Roebuck & Co.,* 949 F. Supp. 1132, 1137 (D. Del. 1996)).

[80] *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 326 (Del. Ch. 2013).

[81] *See WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010).

When determining the scope of a contractual obligation, "the role of a court is to effectuate the parties' intent."[82] Absent ambiguity, the court "will give priority to the parties' intentions as reflected in the four corners of the agreement, construing the agreement as a whole and giving effect to all its provisions."[83] "Unless there is ambiguity, Delaware courts interpret contract terms according to their plain, ordinary meaning."[84]

> In alleging a breach of contract, a plaintiff need not plead specific facts to state an actionable claim. Rather, a complaint for breach of contract is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief." Such a statement must only give the defendant fair notice of a claim and is to be liberally construed.[85]

WCG does not dispute any of the elements of a breach of contract claim except for the ability of a court to grant a remedy. There, WCG relies on narrower framings of the final element that ask whether the Sellers can plead damages. Based on that narrower framing, WCG argues that the Sellers have not pled that the delayed production caused the Sellers any damage.

---

[82] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[83] *In re Viking Pump, Inc.*, 148 A.3d 633, 648 (Del. 2016) (internal quotation marks omitted).

[84] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[85] *VLIW Tech., LLC v. Hewlett-Packard Co.*, 804 A.2d 606, 611 (Del. 2003) (footnote omitted) (quoting Ct. Ch. R. 8(a)(1)).

That argument fails under Delaware's notice pleading regime.[86] The Sellers' allegation that WCG's breach of the Purchase Agreement caused damage is sufficient. That allegation provides "fair notice of the claim[]"[87] and properly seeks damages "in an amount to be determined at trial."[88]

WCG further argues that it is not reasonably conceivable how the breach could result in quantifiable damages. That does not matter. Under Delaware law, "[a] party need not plead cognizable damages as an element of a claim for breach of contract because the court can vindicate a breach of contract through an award of nominal damages."[89]

The motion to dismiss Count III is denied.

## D.      Indemnification.

Count IV alleges that under the Indemnification Provision, WCG must indemnify the plaintiff for "any and all Losses incurred or sustained by, or imposed upon," the Seller by "any breach or non-fulfillment of any covenant, agreement or obligation to be performed by" WCG under the Purchase Agreement.[90] The Sellers

---

[86] Ct. Ch. R. 8(a)(1).

[87] *See VLIW Tech.*, 840 A.2d at 613.

[88] Compl. ¶ 138.

[89] *Cygnus Opportunity Fund, LLC v. Washington Prime Gp.*, LLC, 302 A.3d 430 (Del. Ch. 2023) (cleaned up) (citing *In re P3 Health Gp. Hldgs., LLC*, 2022 WL 16548567, at *9, *30 (Del. Ch. 2022) (collecting cases)).

[90] MIPA § 7.03(b). The Purchase Agreement defines "Losses" as: "losses, claims, damages, liabilities, deficiencies, Actions, judgments, interest, awards, Taxes,

37

argue that they are entitled to indemnification for their losses related to each count. That would plainly constitute duplicative relief, but what makes this theory worth pursuing is the Sellers' potential ability to recover attorneys' fees and costs as indemnifiable losses.

The defendant initially argued that the indemnification claim was not ripe because indemnification is only proper once the plaintiff has a "final adjudication of a claim to be indemnified."[91] At oral argument, the defendant responsibly conceded that this argument made no sense in light of the plain language of the Indemnification Provision.[92]

That left WCG's next argument, which asserts that the Sellers failed to serve notice as required by the Indemnification Provision. But the Purchase Agreement does not specify a particular type or form of notice. The Sellers argue that serving a complaint is a sufficient form of notice.

That is a reasonably conceivable interpretation of the Purchase Agreement. It also makes sense as a policy matter. Delaware law is concerned with actual notice, rather than technicalities that elevate form over substance.[93] Here, the complaint

---

penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' and consultants' fees." *Id.* § 1.

[91] DOB 25.

[92] TX at 24–25.

[93] *Phillips Petroleum Co. v. Arco Alaska, Inc.*, 1986 WL 7612, at *13 (Del. Ch. Jul. 9, 1986) (Jacobs, V.C.) ("Unless prevented by some positive and mandatory law, equity regards substance rather than form.").

serves as actual notice of the Sellers' intent to seek indemnification. The complaint argues that under the Indemnification Provision, the Sellers "are entitled to indemnification for [their] Losses with respect to each of the foregoing Counts, including to the extent such Losses arise from any breach of the [Purchase Agreement]. This includes any attorneys' fees and costs incurred by [the Company] in connection with this action."[94]

It is reasonably conceivable that the language in Count IV constituted sufficient notice under the Purchase Agreement. At a later stage in the proceedings, WCG may argue for a different interpretation of the Purchase Agreement. The motion to dismiss Count IV is denied.

## III.  CONCLUSION

WCG's motion to dismiss is granted as to Count II. The motion is also granted as to Count I for purposes of the statements that constituted puffery. Otherwise, the motion is denied.

---

[94] Compl. ¶¶ 140–141.